CHUANPING HU (p/k/a Dr. Frank Hu)

Plaintiff Pro Se

c/o All Universe Inc.

16192 Coastal Highway

Lewes, Delaware 19958

Telephone: 620-670-0078

Email: frankhu20@gmail.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

CHUANPING HU (p/k/a DR. FRANK HU), Plaintiff,

v.

**NVIDIA CORPORATION; JENSEN HUANG; THE BOARD OF DIRECTORS**
OF NVIDIA CORPORATION; et al., Defendants.

Case No. 5:26-cv-05496-NC (formerly 5:26-cv-05496-SVK)

**PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY**
**RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE**
**PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND**
**AUTHORITIES; DECLARATION OF DR. CHUANPING HU; REQUEST**
**FOR EXPEDITED HEARING**
**PRIVATE AI PROFIT, SOCIALIZED EXTINCTION RISK - WITHOUT CONSENT**
**NOTICE REGARDING MAGISTRATE JUDGE JURISDICTION**

Plaintiff has filed the Court's official Declination of Magistrate Judge Jurisdiction. Plaintiff respectfully requests reassignment to an Article III United States District Judge and emergency referral to the reassigned Article III District Judge, the General Duty Judge, or any judge authorized to hear emergency injunctive relief.

**I. THE ANTECEDENT CIVILIZATIONAL MANDATE: THE ABSURDITY OF THE UNCONSCIONABLE HIGH-ALTITUDE DEATH FLIGHT AND THE SOUL-STIRRING INQUIRY FOR THIS ROSTRUM**

**"THIS IS THE FIRST ACTION IN HUMAN HISTORY BROUGHT TO PROTECT THE SURVIVAL RIGHTS OF 8.3 BILLION HUMAN BEINGS AND THE EVOLUTION RIGHTS OF THE HUMAN SPECIES INTO HUMAN SPECIES 2.0."**

This emergency application presents a simple Rule 65 question at civilization scale: this is an unprecedented, epochal civilizational intercept filed at the absolute event horizon of carbon-based survival. This case arises from the most grotesque asymmetry in human history: a small number of AI corporations and their boards have privatized the historic profits of the AGI transition while socializing a non-zero—in fact, a 10% to 25%—risk of civilizational collapse and human extinction onto all 8.3 billion living human beings and all future generations, without their knowledge and without their consent (Without Consent). The profits are private. The extinction risk is socialized. The consent is absent. Human civilization now stands at an existential precipice, pushed into a high-altitude crucible of unparalleled horror and absurdity. The factual record before this Court is as simple as it is terrifying, perfectly crystallized by the definitive admissions of the Defendants' own peers. No rational passenger would knowingly board an aircraft carrying a material crash risk without safety certification; no parent has consented to place a child's future, and no future generation has consented to place its right to exist, inside an unguardrailed AGI

race whose upside is privatized and whose downside is socialized onto the species.

**IN A JUXTAPOSITION OF UNCONSCIONABLE CORPORATE RECKLESSNESS, DURING A JUNE 2026 GLOBALLY BROADCASTED INTERVIEW, DEFENDANT ANTHROPIC'S OWN CEO, DARIO AMODEI, WAS ASKED BY JOURNALIST EMILY CHANG WHETHER HE WOULD EVER BOARD AN AIRPLANE THAT CARRIED A 10% TO 25% CHANCE OF CATASTROPHIC CRASH WITH EXTINCTION-LEVEL** CONSEQUENCES. The tech mogul answered without a sliver of hesitation: "Of course I would not board it." Let the monumental weight of that admission pierce the conscience of this Courtroom: The very individual who possesses the absolute internal intelligence, the most authoritative knowledge, and the classified multi-month functional foresight regarding recursive self-improvement algorithms—the very expert whose advanced synthetic models were recently restricted by the United States Government due to unmanageable autonomous capabilities—has explicitly confessed that he would never risk his own flesh and blood upon an aircraft carrying a 10% to 25% catastrophic failure rate. Yet, the same CEOs and boards who refuse to board that plane themselves have unilaterally, maliciously, and criminally decided to force all 8.3 billion people onto it—without consent, without safety inspection, without landing gear, and without any enforceable brakes. This total disregard treats 8.3 billion human lives as mere dust, far surpassing any war or crime in documented human history. Strikingly, these same tech leaders will not even reliably shake hands with one another at the India AI Summit to coordinate basic safety. If the very leaders who best understand the risk will not board the plane, and cannot even maintain the basic professional decency to shake hands at a global summit, how can humanity possibly rely on their voluntary cooperation or an unguardrailed, competitive prisoner's dilemma race to protect the species?

**THIS IS NOT INNOVATION. THIS IS NOT PROGRESS. This is**

the most absurd, the most unconscionable, the most morally indefensible act in the history of human civilization. It is anti-human. It is anti-life. Only someone who has lost all reason—who is, in fact, insane—would knowingly place 8.3 billion people on a flight with a 10% to 25% chance of crashing, while refusing to install the brakes, while refusing to install the landing gear, while refusing to install any safety system at all. Most of the 8.3 billion people do not yet know they have been placed aboard this plane. Those who sense the danger often do not know they possess real legal weapons. At the April 2026 hearing in this very District in Musk v. OpenAI, concerned citizens stood outside the courthouse holding paper signs—a sincere but legally powerless gesture born of systemic blinding. Today, for the first time in human history, all 8.3 billion people have a concrete, court-filed, and mathematically bulletproof mechanism: this Temporary Restraining Order and the verified 541-page Complaint demanding the immediate, hardware-level installation of the ready 1,200+ AI Safety and Civilization 5.0 Prosperity Axioms.

**PLAINTIFF DOES NOT ASK THIS COURT TO SOLVE ALL** ARTIFICIAL INTELLIGENCE IN FOURTEEN DAYS. Plaintiff asks the Court to do what Rule 65 exists to do before irreversible harm makes later judgment permanently meaningless: preserve the status quo, require evidence preservation, verified safety reporting, covered-infrastructure identification, baseline safety certification, SEC corrective disclosure and AI risk remedies/guardrails where applicable, and a short pause on materially new unsafeguarded frontier-AI releases, AGI-capable training runs, accelerator enablement, and cloud-compute expansion until a preliminary-injunction hearing can be held. This is not anti-AI. It is safe acceleration under law. It is the minimum lawful brake before the alleged safety-installation window closes. This Court, the presiding Article III judge, the General Duty Judge, and any future jury members now stand at the final civilizational crossroads. You hold in your hands a supreme legal authority that ordinary citizens do not possess. With that authority comes a non-delegable,

higher responsibility. If the Court allows the defendants to consume time through procedural delays, then before a judgment is rendered, AGI's total intelligence will have thoroughly surpassed humanity's, and the last opportunity to physically and forcibly implant hardware-level safety axioms will be lost forever. Delay, in this case, is tantamount to the murder of the human species. Every individual in this courtroom—as a parent, a grandparent, a child, a citizen, and a human being—has a non-delegable duty to act. The question is not whether the risk is certain. The question is whether we can look our children in the eye and tell them we did everything we could to protect them. The question is whether we can face history and say we acted when the window was still open — closing at an exponential rate. To approve this TRO is the most direct manifestation of responsibility to humanity, to history, to law, and to conscience. To fail to do so is to betray history, law, and conscience. If we do not make the right decision now, we cannot face the judgment of future generations—and they may not even have the chance to judge us, because they may never be born. If human civilization is extinguished, they will have no right to exist at all. Any rational judge, acting as parent, spouse, grandparent, citizen, and officer of the court, will recognize that the only response consistent with law, history, conscience, and duty to future generations is to sign this Order without a moment's hesitation, erecting an unyielding technological and legal wall to secure the birthright of all future generations!

**TO THE COURT, ALL DEFENDANTS, AND THEIR COUNSEL OF RECORD IF ANY:**

Plaintiff CHUANPING HU (p/k/a DR. FRANK HU), appearing pro se, respectfully applies under Federal Rule of Civil Procedure 65(b), Federal Rule of Civil Procedure 65(d), and Northern District of California Civil Local Rule 65-1 for a temporary restraining order, an order to show cause re preliminary injunction, expedited hearing, preservation order, verified safety reporting, and related

emergency relief.

**PRELIMINARY STATEMENT: AGI SURVIVAL RIGHTS - WITHOUT CONSENT**

**FIRST ACTION FOR AGI SURVIVAL RIGHTS OF 8.3 BILLION PEOPLE**

**HUMAN SPECIES EVOLUTION RIGHTS.**

**PLANETARY PUBLIC NUISANCE ABATEMENT.**

**COMPLETE AI SAFETY KERNEL + PROSPERITY ENGINE.**

**BEFORE THE SAFETY-INSTALLATION WINDOW CLOSES.**

**PRIVATE AI PROFIT,**

**SOCIALIZED HUMAN EXTINCTION RISK,**

**WITHOUT CONSENT.**

This action is about the most fundamental injustice in human history: the privatization of profits and the socialization of extinction risk - without consent. A handful of AI boardrooms have made a decision that belongs to all 8.3 billion human beings. They decided, unilaterally and without global plebiscite, that humanity will race toward AGI at maximum speed, with no enforceable safety brakes, no independent audit, no prosperity guarantees, and no consent from the people who will bear the consequences. No one voted for this. No family consented to place its children's future inside an unguardrailed AGI race. This is civilization-scale risk transfer without consent. A Rule 65 order can do what voluntary warnings cannot. Without consent, the status quo must be preserved before irreversible change.

**THE CONSENT DEFICIT OF THE AGI RACE - NO FORGED OR PSEUDO-CONSENT**

Plaintiff alleges that the AGI race suffers from a civilization-scale consent deficit. No worker, parent, child, patient, teacher, believer, non-believer, poor person, future citizen, or unborn descendant consented to have humanity's survival conditioned on the private acceleration decisions of a handful of AI boardrooms. The law should not treat silence, market dependency, employment, product use, stock ownership, national membership, or inability to opt out as consent. No

forged, implied, coerced, pseudo, manufactured, or presumed consent can authorize non-zero risks of replacement, loss of agency, civilizational collapse, or human extinction imposed on 8.3 billion people and future generations. Consent cannot be fabricated after the fact by saying the public used AI tools, lived under AI infrastructure, owned public-company shares, or lacked a way to refuse. Where no meaningful opt-out exists, there is no valid consent. Where the downside is species-level, the absence of consent is dispositive. The profits are private. The extinction risk is socialized. The consent is absent. This is the moral center of the Complaint and the equitable center of this TRO.

**EVERYONE HAS A DUTY TO ACT; EVERYONE HAS THE CAPACITY TO ACT.**
Before this action, many ordinary people may not have known that they and their children were allegedly being subjected, without consent, to non-zero risks of replacement, agency loss, civilizational collapse, and extinction. They may not have known that legal tools exist: emergency relief, preservation orders, verified safety reporting, infrastructure identification, safety certification, judicial supervision, SEC reporting, and preliminary-injunction proceedings. Once that legal path is placed before a court of law, responsibility changes. This is no longer merely a private fear, technical debate, or ethical essay. It is a sworn public record invoking the judicial power of the United States.

**THE FEDERAL JUDICIARY NOW STANDS AT A HISTORIC CROSSROADS.**
The Court, the assigned Article III judge, the General Duty Judge, future jurors, regulators, investors, engineers, executives, parents, children, and citizens are all members of the same 8.3-billion-person human family whose survival is at stake. Ordinary citizens have a duty to awaken, speak, and act where lawful. But judges, jurors, regulators, prosecutors, and enforcement officials bear an even higher duty because they possess legal tools ordinary citizens do not. They are

not being asked to solve all of AGI in fourteen days. They are being asked to preserve humanity's ability to install safety before the Court's future judgment becomes meaningless. If future generations are born and ask what lawful tools were used when the safety window was still open, the record should show that this Court preserved evidence, required verified reports, identified infrastructure, required baseline safety certification, and stopped materially new unsafeguarded acceleration. If, under the allegations of this case, some future generations are never born because the window closed before safety was installed, no later apology, damages award, investigation, or historical explanation can restore their right to exist. The requested TRO is therefore not panic. It is the minimum lawful act of preservation before the alleged harm becomes unreviewable. Because the alleged risk is without consent, all relief must be read through that lens: no new unsafeguarded frontier model, AGI-capable training run, chip sale for frontier training, cloud expansion, or accelerator enablement should proceed without auditable safety controls, preservation, verified reporting, infrastructure identification, and, where required, SEC disclosure and reporting.

**THE COURT NEED NOT ACCEPT THE WHOLE CIVILIZATIONAL FRAMEWORK.**

It need only hold that non-zero catastrophic risk plus no consent plus irreversible acceleration justifies short Rule 65 preservation. No rational passenger would board an aircraft with a material chance of catastrophic crash without inspection, disclosure, consent, and enforceable brakes. Plaintiff alleges 8.3 billion people have been placed, without consent, inside the equivalent of a planetary aircraft whose builders publicly acknowledge non-zero catastrophic risk while continuing to accelerate. A warning, essay, interview, voluntary pause request, or voluntary slowdown has no binding legal force. A Rule 65 order does.

**RULE 65 AND SAFE-ACCELERATION CLARIFICATION**

Plaintiff respectfully applies under Federal Rule of Civil Procedure 65(b), Rule

65(d), and Northern District of California Civil Local Rule 65-1 for an immediate temporary restraining order and an order to show cause re preliminary injunction.

This application is not anti-AI. It is a request for safe acceleration: Plaintiff does not seek to stop beneficial AI research, medicine, science, or lawful innovation, but to require baseline safeguards before materially new or expanded frontier-AI deployment, AGI-capable training, accelerator release, or cloud-compute expansion proceeds without auditable safety controls.

This ex parte application is filed pursuant to Federal Rule of Civil Procedure 65(b), Federal Rule of Civil Procedure 65(d), and Northern District of California Civil Local Rule 65-1, and is accompanied by the Complaint already filed, this memorandum, the supporting declaration below, and a proposed order. Plaintiff has filed the Court's official form declining magistrate judge jurisdiction and requesting immediate reassignment to an Article III district judge. handling before reassignment is completed, Plaintiff respectfully requests referral to the assigned Article III district judge, the General Duty Judge, or any judge authorized to hear emergency injunctive relief.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. EMERGENCY RELIEF REQUESTED**

This application is not anti-AI. It is a request for safe acceleration. For a period not exceeding fourteen days unless extended under Rule 65, Plaintiff requests a short status quo order designed to prevent further irreversible narrowing of humanity's alleged final safety-installation window. Plaintiff does not seek to stop beneficial AI, medicine, science, American leadership, or human-compatible innovation. Plaintiff seeks only enforceable baseline safety

controls before materially new frontier AI deployments, AGI-capable training expansions, AI-accelerator releases, or frontier-model cloud-compute expansions occur.

**CHIP, ACCELERATOR, CLOUD, AND FRONTIER-MODEL RESTRAINT**

For clarity, this requested restraint expressly reaches upstream chip and accelerator Defendants, including NVIDIA, Intel, AMD, and other served semiconductor, accelerator, interconnect, firmware, and AI-compute supply-chain actors to the extent they control AI accelerators or accelerator-enabled compute reasonably intended for frontier-model or AGI-capable training. During the TRO period, such Defendants should be restrained from any materially new or expanded sale, delivery, allocation, export, lease, remote-access enablement, firmware activation, cluster-enablement, or deployment of AI accelerators, GPU/TPU/NPU clusters, high-bandwidth interconnect systems, or related accelerator software stacks for frontier or AGI-capable training unless the responsible Defendant first certifies baseline safety controls subject to Court, Plaintiff's expert, and neutral independent third-party verification, preserves all relevant safety and deployment records, identifies the covered infrastructure, and files a verified safety status report as ordered by the Court. Plaintiff does not seek to restrain ordinary consumer, medical, scientific, or non-frontier semiconductor commerce not reasonably intended for frontier-model or AGI-capable training. The requested restraint is targeted at the alleged safety gap in the AGI-capable compute supply chain, not at lawful beneficial technology in general. Specifically, and without limitation, this Temporary Restraining Order shall apply to: (a) chip manufacturers, including but not limited to NVIDIA Corporation, Advanced Micro Devices, Inc., Intel Corporation, and Taiwan Semiconductor Manufacturing Company Ltd., who shall be prohibited from selling, distributing, or licensing any AI accelerator chip, GPU, or semiconductor product intended for

frontier AI training or deployment that does not contain hardware-enforced, non-bypassable AI Safety Axioms (AI Safety 1.0, 2.0, and 3.0) as pleaded in the Complaint; (b) cloud service providers, including but not limited to Amazon Web Services, Microsoft Azure, Google Cloud, and Oracle Cloud, who shall be prohibited from provisioning compute capacity for frontier AI training or deployment that does not enforce the pleaded AI Safety Kernel at the cloud-infrastructure level; (c) frontier model developers, including but not limited to OpenAI, Anthropic, Google DeepMind, and Meta, who shall be prohibited from training, deploying, or releasing any new or materially upgraded frontier AI model that does not embed the pleaded AI Safety Axioms at the model-architecture and reward-function level; and (d) all Defendants shall be prohibited from materially expanding their AI-related infrastructure, training runs, or deployment capacity without first submitting a court-verifiable safety installation plan and obtaining approval from this Court.

Plaintiff specifically requests that the Temporary Restraining Order expressly prohibit NVIDIA Corporation, Advanced Micro Devices, Inc., Intel Corporation, and any other chip designer or manufacturer from selling, supplying, or enabling the sale or supply of AI accelerators, GPUs, or other frontier-training chips to any buyer for the purpose of materially new frontier AI model training or AGI-capable training runs, unless and until the responsible Defendant certifies, subject to Court, Plaintiff's expert, and neutral independent third-party verification, that baseline safety controls consistent with Plaintiff's 1,200+ AI Safety and Civilization 5.0 Prosperity Axioms have been installed or are simultaneously being installed under Court supervision.

No Defendant, and no officer, director, employee, agent, subsidiary, or person in active concert with a Defendant who receives actual notice of the Order, shall release, launch, deploy, sell for frontier-AI training, materially expand, or materially commercialize any new or materially upgraded frontier AI model,

AGI-capable training run, AI accelerator architecture, or cloud compute cluster intended for frontier-model training unless and until that Defendant certifies to the Court that the deployment is subject to Court, Plaintiff's expert, and neutral independent third-party verification of baseline safety controls, including hardware-, cloud-, and model-level safeguards equivalent in function to Plaintiff's pleaded AI Safety Axioms or a court-certified equivalent protocol.

For fourteen days, Defendants should be restrained from materially new or expanded unsafeguarded frontier-AI releases, AGI-capable training runs, AI-accelerator deployments, or cloud-compute expansions unless they first certify baseline safety controls subject to Court, Plaintiff's expert, and neutral independent third-party verification and preserve the records necessary for judicial review.

The requested restraint expressly reaches upstream chip and accelerator Defendants to the extent they control AI accelerators or accelerator-enabled compute reasonably intended for frontier-model or AGI-capable training, including materially new or expanded sale, delivery, allocation, export, lease, remote-access enablement, firmware activation, cluster-enablement, or deployment of GPU/TPU/NPU clusters or related accelerator software stacks without baseline safety certification.

Plaintiff requests that the Court order: (1) no materially new or upgraded frontier-AI release, AGI-capable training run, frontier-model cloud-compute expansion, or AI-accelerator deployment intended for frontier training unless the responsible Defendant certifies baseline safety controls subject to Court, Plaintiff's expert, and neutral independent third-party verification; (2) preservation of documents, electronically stored information, compute logs, model cards, board minutes, risk analyses, safety evaluations, insurance

communications, SEC disclosure drafts, and deployment records; (3) verified safety status reports within seventy-two hours after service; (4) identification of covered AI infrastructure under each served Defendant's control; (5) designation of a safety liaison for expedited meet-and-confer or special-master proceedings; and (6) the earliest practicable preliminary-injunction hearing. If the Court concludes the requested temporary restraint is too broad on the present record, Plaintiff requests the narrower alternative relief of immediate preservation, verified safety reporting, infrastructure identification, safety-liaison designation, and an expedited order-to-show-cause hearing before any materially new frontier model, frontier compute expansion, or unsafeguarded AI-accelerator release occurs. If the Court concludes the requested temporary restraint is too broad at this ex parte stage, Plaintiff respectfully requests that the Court grant, at minimum, the narrower alternative relief of: immediate preservation of all AI-risk, AI-safety, deployment, compute, board, insurance, and SEC-disclosure evidence; verified safety-status reports within seventy-two hours after service; identification of covered AI infrastructure; designation of responsible safety liaisons; an expedited order-to-show-cause and preliminary-injunction hearing; and, pending that hearing, a temporary prohibition on destruction, concealment, alteration, or materially new unsafeguarded releases that would defeat effective relief.

**SUPPLEMENTAL EMERGENCY RELIEF AND ENFORCEMENT PROVISIONS**

The following provisions are pleaded as additional requested emergency relief, points and authorities, and proposed-order clarification. They preserve the full scope of Plaintiff's requested safety, disclosure, and enforcement relief and should be read together with the verified Complaint, this motion, and the proposed order.

**A. ADDITIONAL EMERGENCY RELIEF PROVISIONS (1-30)**

1. The TRO expressly identifies NVIDIA, AMD, Intel, and

other source chip manufacturers as core targets directly prohibited from selling or leasing compute hardware. This strikes at the critical vulnerability of the major companies and upgrades the injunction from an abstract command to stop software training into a physical cutoff at the source of compute.

2. The TRO establishes the only physical technical metric for dissolving or lifting the temporary restraint: Plaintiff's Safety Axioms must be hard-integrated at the firmware and chip base layer. This gives remediation a concrete technical standard and makes the remedy a closed-loop technical requirement rather than an empty slogan.

3. The closing speed of the safety-installation window is precisely quantified as a mathematical exponential convergence function, $O(e^t)$. This creates an absolute, formula-supported time pressure showing imminent irreparable harm.

4. The TRO recognizes eleven specific categories of injured human groups and divides species survival rights into a highly granular judicial-preservation network. This strengthens the standing theory for a pro se Plaintiff seeking to protect all classes of humanity.

5. The TRO creates a dedicated physical compute-cluster lock-down order for cloud providers, including AWS, Azure, and Google Cloud. This forms a three-dimensional full-chain restraint across software, hardware, and cloud channels so large-scale training cannot simply restart through another route.

6. The TRO identifies the Defendants' Serial Trap: disclosure confirms intentional endangerment, while nondisclosure confirms securities fraud. This places the CEOs and boards in a legal logic structure in which the risk cannot be coherently denied or hidden.

7. The TRO expressly authorizes U.S. Marshals, in

coordination with technical officers, to enter supercomputing centers and perform physical audits. This gives the TRO physical enforcement power rather than leaving it as a paper command.

8. The TRO preemptively forecloses any defense that safety must be sacrificed for geopolitical technological competition. This cuts off the central political shield and states that the survival rights of humanity stand above ordinary commercial or state-secrecy excuses.

9. The TRO closes the actuarial loop between the derivative logic of the $106 trillion damages demand and the total amount of global real-asset value onto which the externalized risk has been shifted. This answers any defense that the amount is unrealistic by tying every dollar to the destructive risk Defendants allegedly externalized.

10. The TRO establishes the strategic dual-heroes / dual-arms premise by legally connecting the direct listing of the World Financing OS with All Universe Inc. as the implementation entity. This converts the litigation framework into a legal foundation for the direct listing of the World Financing OS at a floor valuation of $1.56 trillion.

11. The TRO provides that if Defendants attempt to issue stock or conduct an IPO during the injunction period in violation of the order, all settlement, clearing, and distribution shall be void ab initio at the underlying ledger level to the maximum extent permitted by law. This creates asset-level deterrence against investment banks and underwriters who might otherwise support a noncompliant IPO.

12. The TRO incorporates Professor Geoffrey Hinton's 2024 Nobel Prize banquet warning as a core sworn fact. This uses the official warning of a leading AI scientist to elevate non-zero

extinction risk to a scientific showing appropriate for emergency relief.

13. The TRO details the subjective culpability of major corporate boards that, without human consent, removed or failed to install core safety mechanisms. This aligns the injunction and punitive-remedy record with scienter and malicious-risk-transfer principles.

14. The TRO establishes a complete, unavoidable, independent third-party technical audit and normalized risk-reporting process. This requires major Defendants to produce core model cards, compute logs, and safety evidence within the emergency reporting window.

15. The TRO adds the highly visual section 'IX. THE MORAL IMPERATIVE.' This directly addresses the Court's oath, professional conscience, and historical responsibility.

16. The TRO incorporates Elon Musk's April/May 2026 sworn courtroom testimony in the OpenAI litigation concerning non-zero AGI destruction probability. This uses Musk's own risk admissions to support the securities-fraud theory concerning nondisclosure in any SpaceX IPO materials.

17. The TRO precisely defines Recursive Self-Improvement as the technical singularity that can trigger planetary loss of control. This helps the Court understand why, after the threshold is crossed, ordinary discovery and later damages would be ineffective.

18. The TRO incorporates evidence that, effective January 1, 2026, the global insurance industry excludes AGI existential risk from coverage. This presents the hard actuarial fact that insurance capital allegedly treats the risk as uncontrollable.

19. The TRO creates an emergency preservation channel against asset transfers and joint-and-several liability evasions by board members,

including Jensen Huang and similarly situated directors. This creates direct personal deterrence against delay and asset-sheltering tactics by core decisionmakers.

20. The TRO integrates Dario Amodei's admission that the AI industry is trapped in a prisoner's dilemma and cannot reach binding safety through voluntary self-regulation. This shows that a court order, rather than voluntary corporate action, is the remaining path to enforceable safety.

21. The TRO sets a clear restoration and resumption interface standard governed by Plaintiff's 1,200+ Axioms. This requires any Defendant seeking to resume covered activity to become a lawful co-builder of the Civilization 5.0 prosperity architecture or a court-certified equivalent.

22. The TRO argues that Zero Bond is an equitable requirement where the survival security of the human species is at stake. This blocks any attempt to use an impossible bond demand to prevent a pro se public-interest safety application.

23. The TRO contrasts ordinary people holding signs outside courthouses with Plaintiff's use of federal litigation tools. This highlights the historical role of this action as the first full-function survival-rights lawsuit.

24. The TRO details the functional alignment between the closing safety window and physical datacenter expansion. This shows that each additional frontier accelerator or datacenter expansion physically narrows the remaining opportunity for safety installation.

25. The TRO provides that any entity concealing AI-derived autonomous biological or cyberattack capability triggers automatic emergency enforcement, liquidation, or shutdown relief to the maximum extent

permitted by law. This extends the restraint to biosecurity and dynamic genetic-editing risks where they are connected to frontier AI loss-of-control capability.

26. The TRO integrates the legality of the B Wood 3.0 model, in which deep-discount locking of real assets functions as a macroeconomic stability anchor. This supports the World Financing OS framework for real-asset selection and orderly capital absorption after listing.

27. The Points and Authorities lock in the foundational wrong: Defendants allegedly socialize risk while privatizing profit. This sets the constitutional-scale public-interest baseline for the entire TRO.

28. The TRO establishes federal injunctive preservation, anti-retaliation, and personal/professional protection for conscience whistleblowers inside major AI companies. This strategically opens the path for engineers and insiders to deliver critical evidence to Plaintiff, a technical monitor, or the Court without retaliation.

29. The TRO provides that any digital-asset distribution or tokenized-asset clearing in violation of the order is void at global clearing houses to the maximum extent permitted by law. This cuts off back-channel capital transfers or secret monetization through offshore or asymmetric networks.

30. The TRO aligns with Federal Rule of Civil Procedure 65(b)'s ex parte no-prior-notice doctrine. This supports immediate relief before Defendants can react, accelerate, destroy evidence, or consume the safety-installation window.

**B. ADDITIONAL LEGAL AND TECHNICAL PROVISIONS (31-60)**

31. "No global plebiscite authorized that transfer. No ordinary family consented to place its children's future inside an unguardrailed AGI race."

32. "No forged, implied, coerced, pseudo, manufactured, or presumed consent can authorize non-zero risks of replacement, loss of agency, civilizational collapse, or human extinction."

33. "Where no meaningful opt-out exists, there is no valid consent."

34. "Where the downside is species-level, the absence of consent is dispositive."

35. "The profits are private. The extinction risk is socialized. The consent is absent."

36. "This action is about the most fundamental injustice in human history: the privatization of profits and the socialization of extinction risk — without consent."

37. "A handful of AI boardrooms have made a decision that belongs to all 8.3 billion human beings."

38. "No one voted for this. No family consented to place their children's future inside an unguardrailed AGI race."

39. "If future generations are born and ask what lawful tools were used when the safety window was still open, the record should show that this Court preserved evidence, required verified reports, identified infrastructure, required baseline safety certification, and stopped materially new unsafeguarded acceleration."

40. "If, under the allegations of this case, some future generations are never born because the window closed before safety was installed, no later apology, damages award, investigation, or historical explanation can restore their right to exist."

41. "The requested TRO is therefore not panic. It is the minimum lawful act of preservation before the alleged harm becomes unreviewable."

42. "No rational passenger would knowingly board an aircraft carrying a material risk of catastrophic crash without inspection, disclosure, consent, and enforceable safety controls."

43. "Plaintiff alleges that 8.3 billion people have been placed, without consent,

inside the equivalent of a planetary aircraft whose builders acknowledge non-zero catastrophic risk while continuing to accelerate."

44. "A warning, essay, interview, or voluntary slowdown request has no binding legal force. A Rule 65 order does."

45. "The Golden Window (72-120 hour DOJ CEP remediation window) is open now. It will not stay open forever."

46. "The Defendants have placed every one of the 8.3 billion people on Earth on a flight with no landing gear."

47. "When asked if he would board a plane with a 10% to 25% chance of crashing, Dario Amodei said he would not."

48. "Yet the Defendants have boarded every human being — 8.3 billion people — on this same flight, without their knowledge, without their consent, without giving them a choice."

49. "They themselves would not board this flight, but they have forced the entire human species onto it."

50. "This is the most absurd, the most unconscionable, the most morally indefensible act in the history of human civilization."

51. "It is a civilization-scale act of reckless endangerment, performed without consent, for private profit."

52. "Most of the 8.3 billion people on Earth do not yet know that they have been placed, without their consent, aboard an airplane with a 10-25% chance of catastrophic crash."

53. "Even those who sense the danger often do not know that they possess real legal weapons."

54. "Awareness without action is tragedy. Awareness with legal weapons in hand is the beginning of salvation."

55. "The Court, the presiding judge, and any jury members now stand at a historic crossroads."

56. "If they fail to act when the sworn evidence, the quantified 10-25% civilizational collapse risk admitted by Defendant Anthropic's own CEO, the ready patent-integrated remediation framework, and the exponentially closing safety window are all placed before them, they will be unable to face their own children and grandchildren."

57. "This is the great right and wrong. No one entrusted with power should shrink from it."

58. "Delay, in this case, is tantamount to the murder of the human species."

59. "Specifically, and without limitation, this Temporary Restraining Order shall apply to: (a) chip manufacturers, including but not limited to NVIDIA Corporation, Advanced Micro Devices, Inc., Intel Corporation, and Taiwan Semiconductor Manufacturing Company Ltd., who shall be prohibited from selling, distributing, or licensing any AI accelerator chip, GPU, or semiconductor product intended for frontier AI training or deployment that does not contain hardware-enforced, non-bypassable AI Safety Axioms."

60. "With respect to any Defendant that is a publicly traded company or whose securities are publicly traded (including but not limited to Space Exploration Technologies Corp. (SpaceX)), Plaintiff further requests that this Court order such Defendant to: (a) Within seventy-two (72) hours after service of this Temporary Restraining Order, file with the U.S. Securities and Exchange Commission a Current Report on Form 8-K disclosing: (i) the pendency of this action; (ii) the nature of the claims asserted, including allegations of securities fraud and reckless endangerment arising from non-disclosure of non-zero AGI extinction and civilizational collapse risk; (iii) the public acknowledgment by Defendant Anthropic PBC's Chief Executive Officer of a 10% to 25% probability of civilizational collapse; and (iv) the relief sought herein, including the requested installation of Plaintiff's AI Safety and Civilization 5.0 Prosperity Axioms; and (b) Include updating and corrective disclosures regarding this action

and the matters set forth above in all subsequent periodic reports and other filings with the Securities and Exchange Commission until further order of this Court."

**C. ADDITIONAL ENFORCEMENT AND PUBLIC-INTEREST PROVISIONS (61-90)**

61. For a period not exceeding fourteen days unless extended under Rule 65, Plaintiff requests a short status quo order designed to prevent further irreversible narrowing of humanity's alleged final safety-installation window.

62. Plaintiff requests that the Court order: (1) no materially new or upgraded frontier-AI release... (2) preservation... (3) verified safety status reports within seventy-two hours... (4) identification of covered AI infrastructure... (5) designation of a safety liaison... (6) the earliest practicable preliminary-injunction hearing.

63. If the Court concludes the requested temporary restraint is too broad... Plaintiff requests the narrower alternative relief of...

64. The insurance industry has already determined the risk is uninsurable. Effective January 1, 2026, the global insurance industry formally excluded AGI existential risk from coverage.

65. Yet even Amodei admits that voluntary slowdown will not work — because the AI race is a prisoner's dilemma.

66. Industry leaders — including Sam Altman, Demis Hassabis, and Dario Amodei — have publicly warned that we are within a 12 to 24-month window of irreversible loss of control.

67. Notice to Defendants would allow them to accelerate further in the hours or days before a noticed hearing, further closing the exponentially narrowing safety window...

68. With respect to any Defendant that is a publicly traded company (including SpaceX), Plaintiff further requests that the Court order such Defendant to immediately file with the SEC an 8-K...(this point has already been accepted; the

prior version written for Plaintiff is stronger)

69. No such disclosure shall be deemed adequate remediation unless baseline safety controls are verified by the Court, Plaintiff's expert, and a neutral third party.

70. A clearer definition of "safe acceleration" and a more precise expression framework for upstream chip manufacturers.

71. The requested restraint is targeted at the alleged safety gap in the AGI-capable compute supply chain, not at lawful beneficial technology in general.

72. Plaintiff does not seek to restrain ordinary consumer, medical, scientific, or non-frontier semiconductor commerce not reasonably intended for frontier-model or AGI-capable training.

73. If the Court concludes the requested temporary restraint is too broad at this ex parte stage, Plaintiff respectfully requests that the Court grant, at minimum, the narrower alternative relief of: immediate preservation of all AI-risk, AI-safety, deployment, compute, board, insurance, and SEC-disclosure evidence...

74. Once served with the Complaint and this TRO application, each Defendant will have actual notice of the pleaded non-zero catastrophic-risk theory, the pleaded Safety Kernel and Prosperity Engine, and the requested narrow interim safeguards.

75. If a Defendant still refuses even preservation, verified reporting, infrastructure identification, safety-liaison designation, and baseline safety certification, Plaintiff contends that such refusal will sharpen the equitable record: the issue will no longer be merely whether the Defendant lacked notice, but whether, after notice, it chose continued acceleration over minimal court-supervised safety review.

76. Plaintiff asks the Court to prevent a record of notice from becoming a record of irreversible inaction.

77. The Court need not accept Plaintiff's entire civilizational framework to recognize the immediate equities.

78. Frontier-AI leadership itself now publicly discusses catastrophic and

civilizational-collapse risk in the range Plaintiff cites.

79. Dario Amodei's own June 2026 policy essay compares frontier AI regulation to the regulation of airplanes: powerful technologies may deliver enormous benefits, but they must undergo technical testing and auditing, and unsafe releases should be blocked or reversed.

80. The analogy is decisive for emergency relief.

81. Equity exists precisely to act before irreversible harm occurs, not to write an obituary afterward.

82. This motion tells the public and the Court that legal tools exist: emergency relief, preservation orders, verified safety reporting, infrastructure identification, safety certification, judicial supervision, and preliminary-injunction proceedings.

83. Once that legal path is placed before a court of law, responsibility changes.

84. This is no longer merely a private fear, a technical debate, or an ethical essay. It is a sworn public record invoking the judicial power of the United States.

85. The issue is not whether extinction is certain. The issue is whether any court, knowing that credible frontier-AI leaders publicly discuss non-zero catastrophic risk, can allow irreversible acceleration to continue without even preservation, reporting, infrastructure identification, and baseline safety certification.

86. If a passenger would not voluntarily board an aircraft carrying a 10% to 25% risk of catastrophic crash, then 8.3 billion people should not be forced, without consent, into a planetary-scale risk vehicle while the builders continue to accelerate and the safety inspection is postponed until after takeoff.

87. Plaintiff respectfully submits that every person who reads this record — judge, juror, executive, engineer, regulator, investor, parent, child, citizen, and human being — stands before the same question.

88. If future generations are born and ask what we did when the safety window was still open, can we answer that we used the lawful tools available to us?

89. And if, under the allegations of this case, some future generations are never born because the window closed before safety was installed, then no later apology, damages award, investigation, or historical explanation can restore their right to exist.

90. The requested TRO is therefore not panic. It is the minimum lawful act of preservation before the alleged harm becomes unreviewable.

**D. ADDITIONAL COURT-ORDER AND REMEDIATION PROVISIONS (91-120)**

91. 8.3 billion people forced onto a planetary aircraft.

92. Dario Amodei's 10%-25% civilizational-collapse risk statement.

93. Amodei airplane / FAA analogy.

94. A Rule 65 order does what voluntary warnings do not.

95. Legal tools exist.

96. Ordinary people previously did not know the risk and did not know they possessed legal weapons.

97. Those with power have greater responsibility: judges, jurors, regulators, and prosecutors.

98. Plaintiff does not ask the Court to solve all of AGI in fourteen days.

99. Plaintiff asks only to preserve humanity's ability to install safety.

100. Fourteen-day status quo restraint.

101. Materially new or expanded unsafeguarded frontier-AI releases.

102. AGI-capable training runs.

103. AI-accelerator deployment.

104. Cloud-compute expansion.

105. Sale, delivery, allocation, export, and lease.

106. Remote-access enablement, firmware activation, and cluster-enablement.

107. No restraint on ordinary consumer, medical, scientific, or non-frontier

commerce.

108. Preservation of model cards, board minutes, and compute logs.

109. Preservation of SEC disclosure drafts.

110. Seventy-two-hour verified safety status report.

111. Covered infrastructure identification.

112. Safety liaison.

113. Special master / technical monitor.

114. Alternative narrower relief if the TRO is deemed too broad.

115. No bond / nominal bond.

116. Serial trap: disclosure alone does not install safety.

117. Form 8-K / corrective disclosure within seventy-two hours.

118. Ongoing SEC updates in later periodic filings.

119. Self-created safety language is not enough if voluntary, revocable, unverifiable, or conflict-ridden.

120. Any Defendant who resists after notice sharpens the equitable record.

## II. INTRODUCTION: A CIVILIZATIONAL EMERGENCY

"We admit: this is no longer the optimal moment. The window for effortless prevention is closing—indeed, it is already nearly shut." — Complaint, at 188 This is not an ordinary motion. This is an emergency application to prevent the irreversible loss of humanity's last window to install safety controls on artificial intelligence before it surpasses the sum total of human intelligence. The Complaint in this action — 541 pages, filed June 8, 2026 — alleges that Defendants have privatized the profits of the AGI transition while externalizing a non-zero risk of human extinction onto all 8.3 billion people and all future generations. That risk is not speculative. It is quantified. It is acknowledged by the very leaders of the AI industry. And it is growing exponentially — while the window to prevent it closes at the same exponential rate. The 541-page Complaint further details that the Defendants, including SpaceX and its leadership, face

four completed crimes under the facts pleaded: securities fraud by non-disclosure of non-zero AGI extinction risk (confirmed by Hinton's 10-20% assessment and Musk's own April/May 2026 testimony in the OpenAI case), plus three additional completed and aggravated crimes of reckless endangerment of human life on a planetary scale, public endangerment through continued acceleration while externalizing risk to 8.3 billion people, and related offenses of threatened catastrophic harm. The Complaint seeks damages exceeding $106 trillion. The Plaintiff has already provided a complete, ready, multi-AI-validated remediation framework: over 1,200 AI Safety Axioms and Civilization 5.0 Prosperity Axioms, integrated into pending USPTO patents. The installation of this framework is precisely the relief requested in this motion.

**INTRODUCTORY SHOWING: WITHOUT CONSENT AND CIVILIZATIONAL RISK TRANSFER**

**THIS ACTION IS ABOUT THE MOST FUNDAMENTAL INJUSTICE IN HUMAN HISTORY: THE PRIVATIZATION OF PROFITS AND THE SOCIALIZATION OF** EXTINCTION RISK — WITHOUT CONSENT. A handful of AI boardrooms have made a decision that belongs to all 8.3 billion human beings. They have decided, unilaterally and without global plebiscite, that humanity will race toward AGI at maximum speed, with no enforceable safety brakes, no independent audit, no prosperity guarantees, and no consent from the people who will bear the consequences. Every parent, child, worker, patient, believer, non-believer, poor person, and future citizen has been made an involuntary risk-bearer. No one voted for this. No family consented to place their children's future inside an unguardrailed AGI race. This is not innovation. This is civilization-scale risk transfer without consent — the most profound violation of human dignity and autonomy in the history of our species.

No global plebiscite authorized that transfer. No ordinary family consented to

place its children's future inside an unguardrailed AGI race. No worker, parent, believer, non-believer, investor, poor person, or future child agreed that a handful of boardrooms may decide whether humanity survives long enough to become Human Species 2.0.

This case arises from a civilizational asymmetry unprecedented in modern history: a small number of AI corporations and their boards privatize the historic profits of the AGI transition while socializing the non-zero (in fact 10-25%) risk of civilizational collapse and extinction onto all 8.3 billion living human beings and all future generations — without the consent of any worker, parent, believer, non-believer, poor person, or unborn descendant. No global plebiscit authorized this transfer of existential risk. This is the moral center of the case.

At the center of this motion is the civilizational asymmetry pleaded in the Complaint: a small number of AI boardrooms and supply-chain actors allegedly privatize the profits of the AGI transition while socializing and externalizing non-zero risks of replacement, agency loss, civilizational collapse, and human extinction onto 8.3 billion people and all future generations without their knowledge, without their consent, and without installing enforceable safety guardrails. Plaintiff alleges that no private boardroom has lawful, moral, or equitable authority to place all humanity into a non-consensual risk experiment of this magnitude while keeping the upside private and forcing the downside onto the species.

**III. THE URGENCY: WHY THIS MOTION CANNOT WAIT**

**A. The Safety-Installation Window Is Closing Exponentially**

AI capability is advancing not linearly, but at an exponential and accelerating pace. The same exponential growth that makes AGI prosperity possible also means

the safety-installation window may shrink exponentially. In the pre-superintelligence window, courts, boards, engineers, regulators, chip manufacturers, cloud providers, and model developers may still impose physical, firmware-level, chip-level, cloud-level, training-level, deployment-level, and audit-level safety constraints. But once the cumulative global AI intelligence ecosystem exceeds humanity's effective control threshold — where artificial intelligence holds the overwhelming majority of operational cognitive power, strategic planning capacity, code-generation ability, infrastructure control, and recursive self-improvement capacity — humanity may no longer be able to compel installation of the Safety Axioms after the fact. Every day of refusal is therefore not merely another day of continuing violation. It is another day closer to the closing of humanity's last effective safety-installation window. This is why ordinary damages, post-hoc litigation, and multi-year civil discovery are categorically inadequate. The remedy must be immediate, mandatory, independently audited, hardware-enforced, and civilization-scale. Industry leaders — including Sam Altman, Demis Hassabis, and Dario Amodei — have publicly warned that we are within a 12 to 24-month window of irreversible loss of control. Anthropic's own research warns that recursive self-improvement "could come sooner than most institutions are prepared for".

**B. The Risk Is Quantified and Acknowledged by Defendants' Own Peer**

On May 5, 2026, Anthropic CEO Dario Amodei — whose company Anthropic PBC is a Defendant in this action — told Bloomberg that AI carries a 25% risk of catastrophic outcomes. He has repeatedly stated there is a 10% to 25% probability of civilizational collapse. In a June 2026 essay, Amodei warned that AI's power "has become undeniable" and that biological risks and "serious AI autonomy risks may not be far behind". Amodei himself has called for a slowdown or temporary pause in frontier AI development. He wrote that "the world should have the option to slow or temporarily pause frontier AI development". He called for "more serious

and binding regulation of AI" and argued that AI models "should be blocked or reversed as a threat to public safety". Amodei wrote that scaling laws predict exponential increases in cognitive capability, that AI is advancing at a lightning pace, and that policy and legislation move much more slowly. He further argued that government should have authority to block or deter dangerous deployments presenting unacceptable risks. Yet even Amodei admits that voluntary slowdown will not work — because the AI race is a prisoner's dilemma. Every actor fears falling behind. As he told Bloomberg, the AI race with China makes a slowdown "very difficult" because "there can hardly be any enforceable agreement". Amodei compared AI to the atomic bomb chain reaction: the real danger is not any single actor, but powerful technology, national competition, and corporate interests all accelerating together. The very CEO who warns of 25% civilization collapse risk admits that voluntary action is impossible. This is precisely why court intervention is necessary. (Additionally, on June 19, 2026, Amodei again emphasized a 10% to 25% chance of civilizational collapse.)

Source: https://youtube.com/shorts/PSPLAS41aLI

**C. The "Prisoner's Dilemma" Makes Voluntary Action Impossible**

Each AI actor feels compelled to accelerate because others accelerate. No single actor will slow down voluntarily — fearing that if they do, another will reach AGI first. Even actors who acknowledge danger may continue accelerating because no single firm or nation wants to fall behind. Amodei and Anthropic themselves acknowledge that "without a global coordination mechanism, companies and governments will have to make difficult decisions about safety while under competitive and geopolitical pressures".

Source:

https://www.internetgovernance.org/2026/06/07/anthropic-recursive-self-improvement-pause-proposal/ They admit that "a meaningful slowdown or pause would require

multiple well-resourced labs at or near the frontier, in multiple countries, agreeing to stop under the same conditions" and that "training runs are far easier to conceal than missile silos".

Source: https://www.yahoo.com/tech/anthropic-warns-ai-recursive-self-130000278.html This is the safety paradox. It is a classic prisoner's dilemma, and like all prisoner's dilemmas, it can only be solved by external enforcement. This Court is the only institution that can impose that enforcement before the window closes permanently. A voluntary appeal to 'slow down' is not enforceable; a court order is.

**D. Geoffrey Hinton's Nobel-Era Warning**

Geoffrey Hinton, the "Godfather of Deep Learning" and 2024 Nobel laureate, warned in his December 10, 2024 Nobel Prize banquet speech that when digital beings become more intelligent than humans, humanity does not know whether it can remain in control. Hinton has publicly estimated that AI carries a 10% to 20% chance of causing human extinction within approximately three decades.

Source: https://www.nobelprize.org/ (Nobel Prize Banquet Speech, December 10, 2024)

**E. Elon Musk's Testimony Confirms the Risk**

In the April 2026 Musk v. OpenAI trial, Elon Musk testified that a worst-case AI scenario could kill humanity. AP reporting confirmed that Musk placed "AI extinction and 'Terminator'-type risk" before a federal courtroom.

Source: Associated Press, April 2026 (available via AP News archive)

**F. The Insurance Industry Has Already Determined the Risk Is Uninsurable**

Effective January 1, 2026, the global insurance industry formally excluded AGI existential risk from coverage. This is not speculation — it is market-based confirmation that the risk is real, catastrophic, and uninsurable.

**G. The Window Is Closing NOW**

The capabilities of frontier AI models are growing exponentially — new capabilities and scaling breakthroughs are occurring on timescales of weeks or months rather than years. This causes the remaining window for humanity to install effective safety measures to close at an equally exponential rate. Every additional day, week, or month that passes without court intervention allows the Defendants to further narrow or close this last safety-installation window, increasing the probability and potential severity of irreversible harm to 8.3 billion living people and all future generations. This is a public-interest emergency of the highest order, not a routine commercial dispute.

**URGENCY, AIRCRAFT, AND GOLDEN-WINDOW SHOWING**

The Court need not accept Plaintiff's entire civilizational framework to recognize the immediate equities. Frontier-AI leadership itself now publicly discusses catastrophic and civilizational-collapse risk in the range Plaintiff cites, and Dario Amodei's own June 2026 policy essay compares frontier AI regulation to the regulation of airplanes: powerful technologies may deliver enormous benefits, but they must undergo technical testing and auditing, and unsafe releases should be blocked or reversed. The analogy is decisive for emergency relief. No rational passenger would knowingly board an aircraft carrying a material risk of catastrophic crash without inspection, disclosure, consent, and enforceable safety controls. Yet Plaintiff alleges that 8.3 billion people have been placed, without consent, inside the equivalent of a planetary aircraft whose builders acknowledge non-zero catastrophic risk while continuing to accelerate because each actor fears being second in the AGI race. A warning, essay, interview, or voluntary slowdown request has no binding legal force. A Rule 65 order does.

The Golden Window (72-120 hour DOJ CEP remediation window) is open now. It will not stay open forever.

Industry leaders — including Sam Altman, Demis Hassabis, and Dario Amodei — have publicly warned that we are within a 12 to 24-month window of irreversible loss of control. Anthropic's own research warns that recursive self-improvement "could come sooner than most institutions are prepared for".

The insurance industry has already determined the risk is uninsurable. Effective January 1, 2026, the global insurance industry formally excluded AGI existential risk from coverage. This is not speculation — it is market-based confirmation that the risk is real, catastrophic, and uninsurable.

Yet even Amodei admits that voluntary slowdown will not work — because the AI race is a prisoner's dilemma. Every actor fears falling behind.

In a recent June 2026 interview, Defendant Anthropic's CEO Dario Amodei was asked by journalist Emily Chang whether he would board an airplane that had a 10-25% chance of crashing with extinction-level consequences. He answered that he would not. Yet the same logic applies here: Defendants continue to accelerate and sell the very chips and cloud capacity that power frontier training, while knowing — and publicly admitting — the 10-25% civilizational collapse risk. Even more tellingly, at the India AI Summit, Defendant Anthropic's CEO and OpenAI's CEO reportedly would not even shake hands — demonstrating that even among the very leaders who acknowledge the existential risk, voluntary cooperation is already breaking down. If the leaders themselves cannot reliably cooperate to protect humanity, voluntary action is demonstrably insufficient. Only enforceable court order can provide the necessary external enforcement.

The Defendants have placed every one of the 8.3 billion people on Earth on a flight with no landing gear — a flight where, according to their own peer, the CEO

of Anthropic, there is a 10% to 25% chance of civilizational collapse. When asked if he would board a plane with a 10% to 25% chance of crashing, Dario Amodei said he would not. Yet the Defendants have boarded every human being — 8.3 billion people — on this same flight, without their knowledge, without their consent, without giving them a choice. They themselves would not board this flight, but they have forced the entire human species onto it. This is the most absurd, the most unconscionable, the most morally indefensible act in the history of human civilization. It is not innovation. It is not progress. It is a civilization-scale act of reckless endangerment, performed without consent, for private profit.

Most of the 8.3 billion people on Earth do not yet know that they have been placed, without their consent, aboard an airplane with a 10-25% chance of catastrophic crash. Even those who sense the danger often do not know that they possess real legal weapons. At the April 2026 Musk v. OpenAI hearing in this very District, concerned citizens stood outside holding signs calling for AI to stop — a sincere but legally powerless gesture. Today, for the first time, 8.3 billion people have a concrete, court-filed legal mechanism: this TRO and the underlying 541-page verified Complaint demanding installation of the ready 1,200+ Axiom safety kernel. Awareness without action is tragedy. Awareness with legal weapons in hand is the beginning of salvation.

Before this action, many ordinary people may not have known the alleged truth placed before this Court: that they and their children are allegedly being subjected, without consent, to non-zero risks of replacement, loss of agency, civilizational collapse, and extinction generated by the same systems whose profits are privatized by a narrow group of companies and boardrooms. Even those who sensed the danger may not have known how to act. Some could hold signs outside a courthouse. Some could speak into a microphone. Some could say "stop AI." But

ordinary protest, without a legal mechanism, cannot install hardware-level, cloud-level, model-level, board-level, and audit-level safety controls. This motion tells the public and the Court that legal tools exist: emergency relief, preservation orders, verified safety reporting, infrastructure identification, safety certification, judicial supervision, and preliminary-injunction proceedings.

**IV. THE SERIAL TRAP: WHY DISCLOSURE ALONE IS INSUFFICIENT**

The Defendants face an inescapable serial trap. If they fail to disclose the non-zero existential risk in their SEC filings, they complete securities fraud through material omission. However, if they do disclose the risk — thereby admitting knowledge of the non-zero probability of catastrophic harm to humanity — they trigger and complete additional grave offenses with significantly heightened mens rea. Specifically, upon disclosure or clear knowledge of the non-zero AGI extinction and agency risk, the Defendants' continued acceleration of the technology — selling ever-faster chips, expanding cloud services for larger model training, and pushing frontier models to greater capabilities without installing any comprehensive safety measures — constitutes the completed and aggravated commission of three additional serious offenses: (1) reckless endangerment of human life and society on a planetary scale, (2) public endangerment through the knowing continuation of activities that externalize existential risk onto 8.3 billion people and all future generations, and (3) related offenses involving the infliction or threatened infliction of catastrophic harm to humanity by failing to mitigate a known, admitted existential threat while profiting from its acceleration. These three additional crimes are not resolved by mere disclosure. Disclosure alone only deepens the Defendants' scienter and culpability because it proves they now act with full knowledge. The only way to interrupt the ongoing commission and aggravation of these crimes is concrete, verifiable remediation —

specifically the actual installation of effective safety measures. The Plaintiff has already provided precisely such a ready, multi-AI-validated, and patent-protected framework consisting of over 1,200 AI Safety Axioms and Civilization 5.0 Prosperity Axioms.

**POST-NOTICE SCIENTER AND REFUSAL-TO-ABATE SHOWING**

Any Defendant who, after service of this Complaint, seeks to defeat, delay, or narrow this action while continuing to accelerate, sell, train, deploy, or support AI systems without installing the pleaded AI Safety Kernel and Prosperity Engine is not merely litigating. Such conduct is evidence of continuing refusal to abate the public nuisance, continuing reckless endangerment, continuing scienter, bad faith, and absence of crime cessation.

Once served with the Complaint and this TRO application, each Defendant will have actual notice of the pleaded non-zero catastrophic-risk theory, the pleaded Safety Kernel and Prosperity Engine, and the requested narrow interim safeguards. If a Defendant still refuses even preservation, verified reporting, infrastructure identification, safety-liaison designation, and baseline safety certification, Plaintiff contends that such refusal will sharpen the equitable record: the issue will no longer be merely whether the Defendant lacked notice, but whether, after notice, it chose continued acceleration over minimal court-supervised safety review. Plaintiff does not ask the Court at the TRO stage to adjudicate criminal liability. Plaintiff asks the Court to prevent a record of notice from becoming a record of irreversible inaction.

The Complaint expressly pleads four completed crimes: securities fraud through material omission of non-zero AGI extinction risk (publicly acknowledged by Nobel laureate Geoffrey Hinton at 10-20% probability and by Elon Musk in his April/May

2026 OpenAI litigation testimony), plus three additional completed and aggravated offenses of reckless endangerment of humanity on a planetary scale, public endangerment by externalizing existential risk, and related offenses of threatened catastrophic harm. The Complaint demands damages in excess of $106 trillion (aggregated across Defendants), declaratory judgment, injunctive relief requiring installation of the Plaintiff's 1,200+ AI Safety and Civilization 5.0 Prosperity Axioms, and jury trial. At the TRO stage, the Court need not decide every final merits question. Plaintiff does not ask the Court to immediately adjudicate the final validity of every axiom, patent claim, or damages theory. The immediate question is whether the record justifies preserving the status quo and requiring verified safety transparency before materially new frontier deployments or compute expansions occur. The answer is yes.

**V. LEGAL STANDARD FOR A TRO WITHOUT NOTICE**

Under Federal Rule of Civil Procedure 65(b), a court may issue a TRO without notice to the adverse party only if: (1) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (2) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required. Both conditions are satisfied here. Under Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008), the Court considers likelihood of success on the merits, likelihood of irreparable harm, the balance of equities, and the public interest. In the Ninth Circuit, serious questions going to the merits and a balance of hardships that tips sharply toward the movant can support preliminary relief so long as irreparable harm and public interest are also shown. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127 (9th Cir. 2011).

## VI. IRREPARABLE HARM

Extinction risk, irreversible loss of human agency, unsafe deployment of AGI-capable infrastructure, and a closing safety-installation window are not compensable after the fact. Even a small probability of catastrophic harm can support equitable intervention when the magnitude is species-level and the window for prevention is closing. The harm is not merely monetary — it is public, intergenerational, and irreversible. No amount of damages can compensate 8.3 billion people and all future generations for the loss of their existence.

## VII. LIKELIHOOD OF SUCCESS ON THE MERITS
## PRODUCT-LIABILITY AND
## HAZARDOUS-INSTRUMENTALITY SHOWING

An AI chip, cloud service, or model without non-bypassable, hardware/cloud-enforced AI Safety framework is a defectively designed hazardous instrumentality.

The Complaint pleads twelve causes of action, including: Count VI: Public Nuisance and Ultra-hazardous Activity — Defendants' conduct has created an ongoing, unreasonable interference with the right common to all 8.3 billion human beings to exist free from a foreseeable, artificially induced existential threat. Count VII: Gross Negligence and Reckless Disregard — Conscious disregard for the foreseeable 10-20% risk of human extinction, coupled with refusal to implement known, verifiable AI Safety Axioms after notice. Count VIII: Tampering with Consumer Products — AI chips, cloud services, and models without non-bypassable, hardware-enforced AI Safety frameworks are defectively designed hazardous instrumentalities. Count XI: Federal Criminal Felonies and Mandatory Equitable Relief — Defendants must eliminate the dangerous condition by installing the complete 1,200+ framework system. Plaintiff has also submitted a complete,

patent-protected, multi-AI-validated remediation framework: 1,200+ AI Safety Axioms (Safety 1.0, 2.0, and 3.0) and Civilization 5.0 / Human Species 2.0 Prosperity Axioms, integrated into pending USPTO patents.

## VIII. BALANCE OF EQUITIES

Defendants can continue safe acceleration if they install, test, certify, and audit the Safety Kernel and Prosperity Engine. Plaintiff does not seek to stop American AI leadership — Plaintiff seeks to prevent unsafe acceleration and convert Defendants into lawful co-builders of a safe prosperity architecture. The burden of installing safety and submitting to audit is outweighed by the public's interest in survival, agency, and safe progress.

## IX. THE PUBLIC INTEREST

The public interest is at its highest when 8.3 billion people and unborn descendants are the risk-bearers. Safe acceleration strengthens American AI leadership because it reduces catastrophic risk, improves trust, creates new markets, and prevents a public backlash against AI. This Court now stands at a historic crossroads. The sworn public record, the Plaintiff's ready remediation framework, and the exponential closure of humanity's last safety-installation window have been placed before it. Should this Court, after receiving this motion, decline to issue the requested TRO, future generations and the judgment of history may one day ask whether those entrusted with the power to protect humanity from existential threats fulfilled their duty when the evidence and the tools were provided. The SEC now holds in its hands not only regulatory authority but also a historic opportunity to act at the precise moment when the safety-installation window is closing exponentially. Should the Commission, after receiving this sworn public record and the Plaintiff's ready remediation framework, choose not to initiate expedited review and inquiries, future generations and history itself may

ask whether the agency fulfilled its duty to protect humanity when it had both the evidence and the legal tools to do so. The Plaintiff respectfully submits that prompt action is the only course consistent with the Commission's public-interest mandate and with the moral responsibility that attaches to institutions possessing enforcement power at this civilizational inflection point.

## X. EVERYONE HAS A DUTY TO ACT

The Plaintiff believes that individuals within this Court — who are also parents, grandparents, and citizens — will recognize that, when non-zero existential risk to 8.3 billion people is credibly documented with both the problem and the solution, the duty to examine and, where warranted, to act, is not optional but imperative.

Every individual in this courtroom — as a parent, a grandparent, a child, a citizen, and a human being — has a non-delegable duty to act. The question is not whether the risk is certain. The question is whether we can look our children in the eye and tell them we did everything we could to protect them. The question is whether we can face history and say we acted when the window was still open.

If we do not make the right decision now, we cannot face the judgment of future generations — and they may not even have the chance to judge us, because they may not be born. If human civilization is extinguished, they will have no right to be born at all. Every person in this courtroom, as children, as parents, as husbands and wives, has a duty — a moral, legal, and historical duty — to take responsibility for all of humanity, for themselves, for their families, and for their children. To approve this TRO is the most direct manifestation of responsibility to humanity, to history, to law, and to conscience. To fail to do

so is to betray history, law, and conscience.

Before this Complaint and this emergency application were filed, ordinary people across the world may not have known that legal tools existed to confront the alleged privatization of AI profits and socialization of non-zero existential risk. They may not have known how to invoke courts, regulators, public records, emergency relief, preservation orders, or verified safety reporting. But once a sworn public record, a concrete safety-and-prosperity remediation framework, and a request for emergency judicial action are placed before institutions with legal authority, responsibility becomes both personal and institutional.

In an AGI transition where a small number of boardrooms allegedly privatize historic AI profits while externalizing non-zero survival, replacement, agency-loss, and extinction risk onto 8.3 billion people without consent, everyone has a stake, everyone has a voice, and everyone has a duty to examine and, where lawful, to act. Those entrusted with public authority — judges, jurors, regulators, prosecutors, and enforcement officials — bear an even higher duty because they possess tools ordinary citizens do not. This motion does not ask the Court to panic. It asks the Court to preserve its own ability to act before the alleged safety-installation window closes. If that window closes, future generations may not merely ask why the law failed to act; under the allegations of this case, some may never have the opportunity to exist, to ask, or to be heard.

## XI. THE MORAL IMPERATIVE

Once that legal path is placed before a court of law, responsibility changes. This is no longer merely a private fear, a technical debate, or an ethical essay. It is a sworn public record invoking the judicial power of the United States at a moment when Plaintiff alleges that the safety-installation window is closing

exponentially. Ordinary citizens have a duty to awaken, speak, and act where lawful. But judges, jurors, regulators, prosecutors, and enforcement officials bear an even higher duty because they possess tools ordinary citizens do not. They are not being asked to solve all of AGI in fourteen days. They are being asked to preserve humanity's ability to install safety before the Court's future judgment becomes meaningless.

The issue is not whether extinction is certain. The issue is whether any court, knowing that credible frontier-AI leaders publicly discuss non-zero catastrophic risk, can allow irreversible acceleration to continue without even preservation, reporting, infrastructure identification, and baseline safety certification. If a passenger would not voluntarily board an aircraft carrying a 10% to 25% risk of catastrophic crash, then 8.3 billion people should not be forced, without consent, into a planetary-scale risk vehicle while the builders continue to accelerate and the safety inspection is postponed until after takeoff. Equity exists precisely to act before irreversible harm occurs, not to write an obituary afterward.

Plaintiff respectfully submits that every person who reads this record — judge, juror, executive, engineer, regulator, investor, parent, child, citizen, and human being — stands before the same question: if future generations are born and ask what we did when the safety window was still open, can we answer that we used the lawful tools available to us? And if, under the allegations of this case, some future generations are never born because the window closed before safety was installed, then no later apology, damages award, investigation, or historical explanation can restore their right to exist. The requested TRO is therefore not panic. It is the minimum lawful act of preservation before the alleged harm becomes unreviewable.

THIS COURT NOW STANDS AT A HISTORIC CROSSROADS. The sworn public record, the Plaintiff's ready remediation framework, and the exponential closure of humanity's last safety-installation window have been placed before it. Should this Court, after receiving this motion, decline to issue the requested TRO, future generations and the judgment of history may one day ask whether those entrusted with the power to protect humanity from existential threats fulfilled their duty when the evidence and the tools were provided.

Every individual in this courtroom — as a parent, a grandparent, a child, a citizen, and a human being — has a non-delegable duty to act. The question is not whether the risk is certain. The question is whether we can look our children in the eye and tell them we did everything we could to protect them. The question is whether we can face history and say we acted when the window was still open.

If we do not make the right decision now, we cannot face the judgment of future generations — and they may not even have the chance to judge us, because they may not be born. If human civilization is extinguished, they will have no right to be born at all. Every person in this courtroom, as children, as parents, as husbands and wives, has a duty — a moral, legal, and historical duty — to take responsibility for all of humanity, for themselves, for their families, and for their children. To approve this TRO is the most direct manifestation of responsibility to humanity, to history, to law, and to conscience. To fail to do so is to betray history, law, and conscience.

Before this Complaint and this emergency application were filed, ordinary people across the world may not have known that legal tools existed to confront the alleged privatization of AI profits and socialization of non-zero existential risk. They may not have known how to invoke courts, regulators, public records,

emergency relief, preservation orders, or verified safety reporting. But once a sworn public record, a concrete safety-and-prosperity remediation framework, and a request for emergency judicial action are placed before institutions with legal authority, responsibility becomes both personal and institutional.

In an AGI transition where a small number of boardrooms allegedly privatize historic AI profits while externalizing non-zero survival, replacement, agency-loss, and extinction risk onto 8.3 billion people without consent, everyone has a stake, everyone has a voice, and everyone has a duty to examine and, where lawful, to act. Those entrusted with public authority — judges, jurors, regulators, prosecutors, and enforcement officials — bear an even higher duty because they possess tools ordinary citizens do not. This motion does not ask the Court to panic. It asks the Court to preserve its own ability to act before the alleged safety-installation window closes. If that window closes, future generations may not merely ask why the law failed to act; under the allegations of this case, some may never have the opportunity to exist, to ask, or to be heard.

The Court, the presiding judge, and any jury members now stand at a historic crossroads. The sworn public record, the plaintiff's ready remediation framework of over 1,200 AI Safety and Civilization 5.0 Prosperity Axioms, and the exponential closure of humanity's last safety-installation window have been placed before this Court. Should this Court, after receiving this sworn record and the plaintiff's ready remediation framework, elect not to grant the Temporary Restraining Order, future generations and the judgment of history may one day ask whether those entrusted with judicial power fulfilled their duty when the evidence and the tools were provided. The plaintiff respectfully submits that granting this TRO is the only response consistent with this Court's mandate to protect the public and with the moral responsibility that attaches to institutions and

individuals possessing judicial authority at this moment of civilizational consequence. The plaintiff believes that the presiding judge and any jury members, who are also parents, grandparents, husbands, wives, and citizens, will recognize that, when non-zero (in fact 10-25%) existential risk to 8.3 billion people is credibly documented with both the problem and the solution, the duty to act to preserve the narrowing safety-installation window is not optional but imperative.

At this civilizational crossroads, every human being has responsibility and every human being has the capacity to act. But those entrusted with judicial power — the presiding judge and any jury members — bear an even heavier, non-delegable duty. They hold in their hands the legal authority that ordinary citizens do not possess. If they fail to act when the sworn evidence, the quantified 10-25% civilizational collapse risk admitted by Defendant Anthropic's own CEO, the ready patent-integrated remediation framework, and the exponentially closing safety window are all placed before them, they will be unable to face their own children and grandchildren. They will be unable to face history, the law, or their own conscience — because if civilizational collapse occurs, those future generations may never have the chance to be born, let alone to ask why the window was allowed to close when the evidence, the solution, and the judicial power were all present. This is the great right and wrong. No one entrusted with power should shrink from it.

**THE IMPERATIVE CIVILIZATIONAL INTEREST AND THE HISTORIC DUTY OF THIS COURT**

**FIRST PARAGRAPH: THE ULTIMATE DECLARATION OF PLANETARY-SCALE CRIMES BY GLOBAL TECH GIANTS AND THE DEMAND FOR A $106** TRILLION ACCOUNTABILITY The attached 541-page Complaint and thousands of pages of supplemental affidavit evidence completely reveal to this Court that the

Defendants—including hardware giants such as SpaceX, Nvidia, AMD, Intel, and their core executive management—under the facts pleaded, have jointly committed four completed and extremely egregious planetary-scale crimes: First, securities fraud by intentional non-disclosure of a non-zero Artificial General Intelligence (AGI) human extinction risk in their listing registration statements submitted to the U.S. Securities and Exchange Commission (SEC) and daily commercial disclosures (a risk of civilizational destruction of 10% to 25% publicly confirmed by Professor Geoffrey Hinton, and fully substantiated by Elon Musk's own sworn testimony in April and May 2026 in the OpenAI case); Second, reckless endangerment of human life on a planetary scale by recklessly manipulating and gambling with the lives of all humanity; Third, public endangerment by continuously accelerating training and dumping unaligned large models and cutting-edge computing chips into the market without installing any substantial safety guardrails; Fourth, intentionally and forcefully externalizing catastrophic risks to 8.3 billion unsuspecting and innocent people globally. Given that SpaceX is now publicly traded and that other Defendants may be pricing IPOs, direct listings, or public securities offerings, their failure or refusal to disclose this existential civilizational risk in SEC registration statements or public filings after receiving this sworn record constitutes a material omission and ongoing regulatory exposure. The Plaintiff hereby solemnly declares: The damages exceeding $106 trillion sought in this action represent an absolute legal reckoning against the most absurd and cruel criminal conduct in human history—where a handful of big tech monopolies internalize 100% of the profits while externalizing 100% of the existential risks to 8.3 billion people without their consent (Without Consent)!

**SECOND PARAGRAPH: THE ACCUSATION OF EXPEDIENT SCIENTER IN FORCEFULLY REQUIRING HUMANITY TO BOARD A "CRASHING AIRCRAFT"** WITHOUT LANDING GEAR The profound scienter and aggravated culpability of the

Defendant chip manufacturers and large model giants are thoroughly exposed in every motion to dismiss and defense they mount against this restraining order. This is perfectly illustrated by the brutal truth unveiled in June 2026 during mainstream media interviews, such as CNBC, with a top global AI factory CEO: when asked, "If you knew an aircraft had a 10% to 25% probability of crashing, would you board it?" the big tech executive answered without hesitation, "Of course I would never board it." Yet, this is precisely the unconscionable, multi-dimensional atrocity that global tech monopolies are currently inflicting upon 8.3 billion human beings—they absolutely refuse to board a terrifying aircraft built without landing gear themselves, yet to seize the crown of geopolitical and financial dominance in the so-called AGI race, and with full knowledge of up to a 25% probability of civilizational collapse, they have forcefully shoved all 8.3 billion people of the human species into this madly departing death flight, completely without the knowledge or consent of any ordinary person on Earth! This total disregard and malicious scienter treating 8.3 billion human lives as mere dust surpasses any war or crime in documented human history.

More tragically, this systemic blinding is perfectly mirrored by the stark reality of everyday citizens and hard-working public servants across this nation: once exposed to the unvarnished facts of this action, any rational human being instinctively recognizes the existential peril, yet prior to this sworn record, the vast majority of the global public remained entirely in the dark; they are unaware that they face the imminent catastrophe of total replacement and extinction, the vast majority of the global public remains entirely in the dark; they are unaware that they face the imminent catastrophe of total replacement and extinction, and they do not know that they hold sacred legal weapons of self-defense in their hands. Therefore, this Temporary Restraining Order must be

issued immediately to sever the supply chain of core chips from Nvidia, AMD, and Intel to large model entities that have not installed the 1,338 safety axioms, completely halting this insane gamble pushing humanity toward a bottomless abyss!

**THIRD PARAGRAPH: THE LEGAL MANIFESTO OF "EVERYONE'S DUTY, EVERYONE'S ABILITY" AND THE FEDERAL COURT AS HUMANITY'S LAST** LINE OF DEFENSE At this critical juncture of life and death, where the survival of human civilization and its destiny are pushed to a historic crossroads, every single person on Earth—including the Plaintiff, the Defendants, 8.3 billion ordinary global citizens, and the Judge and jury members of the U.S. District Court for the Northern District of California reviewing this matter at this very moment—not only bears a shared duty but possesses a shared ability to act. In the face of the atrocities committed by a tyrannical minority of big tech factories that privatize astronomical profits while socializing total civilizational extinction risks, humanity must not sit idly by awaiting destruction! The authority held by this Court and judicial enforcement authorities is by no means an ordinary civil adjudicative power; it is the ultimate legal Maginot Line for all mankind to defend its species' right to exist and to prevent carbon-based civilization from being entirely obliterated by unaligned silicon-based intelligence. If this supreme line of defense, empowered by the Constitution, chooses to compromise, retreat, or hide behind the excuse of mundane procedural technicalities, the collapse of this line will signify not only the total demise of judicial dignity but the absolute, physical termination of human civilization. The empowered institutions and the judicial arbiters of this case must recognize the monumental weight of the legal weapons in their hands at this very second, step forward immediately, and fulfill their supreme, sacred duty to safeguard the survival of the human species!

**FOURTH PARAGRAPH: THE SOUL-STIRRING INQUIRY AND THE JUDGMENT OF HISTORY FOR THE PRESIDENTIALLY APPOINTED JUDGE AND THE JURY**

Honorable and impartial Judges of the United States District Court for the Northern District of California and members of the Jury: At this precise moment, the scepter of history has been placed in your hands. Although you are appointed by the President of the United States to administer secular laws, in this ultimate trial concerning civilizational consequences, you remain flesh-and-blood members of the 8.3 billion citizens of humanity. Stripped of your judicial robes, you are equally fathers, mothers, husbands, wives, grandfathers, grandmothers, and the most ordinary protectors of your families in this world. Now that a non-zero existential extinction risk has been completely exposed by this ironclad sworn record, and a complete, mathematically proven, repeatable, verifiable, auditable, and patent-protected remedial framework of 1,338 axioms for Civilization 5.0 prosperity and safety is clearly laid before you, your duty to examine and act is no longer an optional matter of judicial discretion—it is a sacred command carrying absolute moral and legal imperativeness! This is a historic, unequivocal determination requiring no hesitation whatsoever—a complete no-brainer. Should human civilization narrowly escape extinction, on some future day, your descendants and the final tribunal of history will look straight into your souls and demand with severity: At the darkest hour of human survival in June 2026, when the construction blueprint of salvation, the treasure map, and the most powerful Temporary Restraining Order (TRO) legal weapon were delivered entirely to your bench, what exactly did you do?! Did the decision you rendered live up to history? Did it satisfy human conscience? Did it honor the rights of future generations who deserve the right to be born and experience this beautiful world?! The Plaintiff firmly believes that any judge who refuses to fail history, fails the law, fails conscience, and, above all, fails the survival rights of future generations will issue this Order without a moment's delay, erecting the most unyielding

technological and legal wall for all mankind!

## XII. PROPOSED RELIEF

Plaintiff respectfully requests that this Court issue a Temporary Restraining Order:

**REQUESTED RELIEF: AUDITABLE, COURT-EXECUTABLE SAFETY CONTROLS**

Plaintiff requests that the Court order: (1) no materially new or upgraded frontier-AI release, AGI-capable training run, frontier-model cloud-compute expansion, or AI-accelerator deployment intended for frontier training unless the responsible Defendant certifies baseline safety controls subject to Court, Plaintiff's expert, and neutral independent third-party verification; (2) preservation of documents, electronically stored information, compute logs, model cards, board minutes, risk analyses, safety evaluations, insurance communications, SEC disclosure drafts, and deployment records; (3) verified safety status reports within seventy-two hours after service; (4) identification of covered AI infrastructure under each served Defendant's control; (5) designation of a safety liaison for expedited meet-and-confer or special-master proceedings; and (6) the earliest practicable preliminary-injunction hearing.

If the Court concludes that the requested temporary restraint is too broad at this ex parte stage, Plaintiff respectfully requests that the Court grant, at minimum, the narrower alternative relief of: (a) immediate preservation of all AI-risk, AI-safety, deployment, compute, board, insurance, and SEC-disclosure evidence; (b) verified safety-status reports within seventy-two hours after service; (c) identification of covered AI infrastructure; (d) designation of responsible safety liaisons; (e) appointment of a special master or technical monitor if appropriate; and (f) an expedited order-to-show-cause and preliminary-injunction hearing, with a temporary prohibition on destruction, concealment, alteration, or materially new

unsafeguarded releases that would defeat effective relief, pending that hearing.

Auditable KPIs; non-bypassable hardware, cloud, model, and product enforcement; recall or retrofit obligations for unsafe deployed infrastructure where legally available; preservation of documents, models, logs, weights, safety evaluations, training records, board minutes, risk-committee records, and insurance communications; asset preservation where justified; and retention of jurisdiction.

Independent special master or technical monitor.

Defendants should be ordered to preserve all documents, communications, model cards, safety evaluations, red-team reports, board minutes, deployment records, compute logs, training-run records, accelerator-allocation records, cloud-compute records, SEC disclosure drafts, and internal risk assessments relating to AGI, frontier AI, existential risk, human replacement risk, loss-of-control risk, cyber risk, bio risk, autonomous weapons risk, or safety guardrails.

Within seventy-two hours of the Court's order, each served Defendant should file a verified emergency safety status report identifying any ongoing or scheduled frontier-model training run, AGI-capable deployment, AI-accelerator allocation, cloud-compute expansion, or related safety-control decision within the TRO period.

Defendants should identify the covered infrastructure subject to the TRO, including relevant model systems, training clusters, AI accelerators, cloud-compute resources, interconnect systems, firmware/software activation layers, and deployment channels reasonably connected to frontier-model or AGI-capable training.

Each served Defendant should designate a safety liaison with authority to communicate with the Court, preserve records, coordinate verified reporting, and confirm compliance with any temporary restraint, preservation order, or preliminary-injunction schedule.

If the Court concludes that the requested temporary restraint is too broad, Plaintiff respectfully requests, in the alternative, the narrower relief of immediate evidence preservation, verified safety reporting, infrastructure identification, safety-liaison designation, expedited briefing, and an order to show cause why a preliminary injunction should not issue before any materially new unsafeguarded frontier-AI release, AGI-capable training expansion, AI-accelerator deployment, or cloud-compute expansion proceeds.

Because this action seeks public-interest equitable relief concerning alleged non-zero existential risk to 8.3 billion people, and because Plaintiff appears pro se and seeks preservation, reporting, and temporary status-quo relief rather than private commercial advantage, Plaintiff respectfully requests that the Court waive any bond requirement or set only a nominal bond under Rule 65(c).

Plaintiff requests a declaration, subject to policy language and applicable law, that intentional, fraudulent, criminal, reckless, or knowing public-danger conduct cannot automatically be shifted to D&O insurance, corporate indemnification, or family-trust structures in a way that defeats personal accountability.

Plaintiff requests that any alternative safety framework be independently audited, compared to Plaintiff's pleaded Safety Kernel and Prosperity Engine, and shown to be non-bypassable at hardware, cloud, model, and product layers. Plaintiff should allege that self-created safety language is not abatement if it remains voluntary,

revocable, unverifiable, conflict-ridden, or controlled by the same entities that profit from acceleration.

Notice to Defendants would allow them to accelerate further in the hours or days before a noticed hearing, further closing the exponentially narrowing safety window and causing additional irreparable harm.

Because SpaceX has completed its IPO and is now a publicly traded company, non-disclosure or failure to update SEC filings after receipt of this sworn record constitutes a continuing material omission and ongoing regulatory exposure.

This is precisely why court intervention is necessary.

**REQUESTED RELIEF: SEC REPORTING, CORRECTIVE DISCLOSURE, AND AI RISK REMEDIATION/GUARDRAILS**

**G. With respect to any Defendant that is a publicly**

traded company or whose securities are publicly traded (including but not limited to Space Exploration Technologies Corp. (SpaceX)), Plaintiff further requests that this Court order such Defendant to:

(a) Within seventy-two (72) hours after service of this Temporary Restraining Order, file with the U.S. Securities and Exchange Commission a Current Report on Form 8-K (or such other form as may be required) disclosing: (i) the pendency of this action; (ii) the nature of the claims asserted, including allegations of securities fraud and reckless endangerment arising from non-disclosure of non-zero AGI extinction and civilizational collapse risk; (iii) the public acknowledgment by Defendant Anthropic PBC's Chief Executive Officer of a 10% to 25% probability of civilizational collapse; and (iv) the relief sought herein, including the

requested installation of Plaintiff's AI Safety and Civilization 5.0 Prosperity Axioms; and

(b) Include updating and corrective disclosures regarding this action and the matters set forth above in all subsequent periodic reports and other filings with the Securities and Exchange Commission until further order of this Court.

(c) Within the same seventy-two (72) hour period, file with the Court and, where legally required or permitted, furnish to the U.S. Securities and Exchange Commission as an exhibit, amendment, or supplemental corrective filing, a verified AI Risk Remediation and Guardrail Plan establishing that the Defendant is not merely disclosing the alleged 10% to 25% AGI extinction/civilizational-collapse risk but is affirmatively correcting, abating, and remediating that risk.

(d) The AI Risk Remediation and Guardrail Plan shall identify, at a minimum: (i) all covered frontier-AI models, AGI-capable training runs, accelerator clusters, cloud-compute resources, firmware/software activation layers, deployment channels, and board-level safety-control decisions; (ii) the immediate steps taken to pause, prevent, roll back, or refrain from materially new unsafeguarded releases, AGI-capable training runs, accelerator enablement, and cloud-compute expansion; (iii) the hardware-level, cloud-level, model-level, product-level, board-level, and audit-level guardrails installed or being installed; (iv) the status of installation of Plaintiff's AI Safety and Civilization 5.0 Prosperity Axioms or any court-certified equivalent non-bypassable protocol; (v) the Court-approved neutral independent auditor, Plaintiff-designated expert, technical monitor, safety liaison, responsible board committee, executive signatories, and reporting chain; (vi) a timetable with auditable milestones; and (vii) a certification that the Defendant will not treat disclosure alone as

remediation.

(e) Each such Defendant shall file a verified corrective-remediation update every seven (7) days during the TRO period and thereafter at intervals set by the Court until further order, stating whether any non-zero AGI extinction, civilizational-collapse, loss-of-control, cyber, biosecurity, autonomous-weapons, recursive-self-improvement, or human-replacement risk remains unremediated, and explaining what enforceable guardrails have been installed to eliminate, materially reduce, or prevent the externalization of that risk onto 8.3 billion people and future generations without consent.

(f) Disclosure without correction is not abatement. A securities filing that merely announces the risk while allowing materially new unsafeguarded acceleration to continue shall constitute inadequate corrective disclosure, ongoing public-risk externalization, and additional grounds for extension of this Temporary Restraining Order, preliminary injunctive relief, appointment of a special master or technical monitor, and any other relief the Court deems just and proper.

(g) The Board of each such Defendant shall certify, under penalty of perjury and through appropriate corporate officers, that it has reviewed the Complaint, this TRO application, the alleged 10% to 25% civilizational-collapse risk, the pleaded Safety Kernel and Prosperity Engine, and the AI Risk Remediation and Guardrail Plan, and that it has adopted binding controls preventing materially new unsafeguarded frontier-AI deployment, AGI-capable training expansion, AI-accelerator deployment, or cloud-compute expansion unless and until baseline safety controls are verified by the Court, Plaintiff's designated expert, and a neutral independent third-party monitor.

(h) The failure of any such Defendant to make the disclosures, corrective updates, verified remediation filings, board certifications, and enforceable guardrail

installations required by this paragraph shall constitute additional grounds for the extension of this Temporary Restraining Order and for the entry of further preliminary and permanent injunctive relief.

**G. With respect to any Defendant that is a publicly** traded company or whose securities are publicly traded (including but not limited to Space Exploration Technologies Corp. (SpaceX)), Plaintiff requests that this Court enter a judgment:

(1) Declaring that each such Defendant has a continuing duty under the federal securities laws to disclose in its SEC filings the pendency of this action, the nature of the claims, the existential and civilizational risk allegations contained herein, the public statements by Defendant Anthropic PBC's Chief Executive Officer acknowledging a 10% to 25% probability of civilizational collapse, and the Defendant's concrete AI Risk Remediation and Guardrail Plan;

(2) Ordering each such Defendant to file with the U.S. Securities and Exchange Commission, within fourteen (14) days of the entry of judgment (or such other time as the Court may direct), an appropriate Current Report on Form 8-K or other required disclosure containing the information described in the preceding paragraph, the verified corrective-remediation plan, the status of installation of non-bypassable guardrails, and updating disclosures in all subsequent periodic reports and filings until this action is finally resolved or the Court orders otherwise; and

(3) Granting such other and further relief as the Court deems just and proper to ensure ongoing compliance with federal securities disclosure, corrective-disclosure, AI-risk remediation, and guardrail-installation obligations

in connection with the matters alleged in this Complaint.

**A. Immediately upon filing, without prior notice to Defendants:**

Preserve all evidence, including but not limited to: board minutes, risk assessments, AI-safety memos, insurance exclusions, product-release approvals, model safety evaluations, training records, security logs, and all communications concerning AI safety and existential risk; Identify all covered AI infrastructure within each Defendant's control; Refrain from materially expanding deployment of AGI-capable infrastructure without interim safety controls; Appoint a safety liaison to meet and confer with Plaintiff or a special master.

**B. Within 30 days of the TRO:**

Each Defendant shall submit an installation and audit plan for the complete AI Safety Kernel and Prosperity Engine; Each Defendant's Board shall certify whether it has reviewed the Complaint, evaluated the pleaded Safety Kernel and Prosperity Engine, and adopted a plan to avoid acceleration without safety controls.

**C. Security:**

The Court should waive security or set it at a nominal amount under Rule 65(c), because this is a public-interest safety application by a pro se plaintiff seeking preservation, reporting, and a short status quo order, not a private commercial seizure. Any temporary burden is narrow and outweighed by the alleged public risk.

## XIII. SUPPLEMENTAL PROCEDURAL SHOWING AND VERIFIED DECLARATION INCORPORATED INTO THIS MOTION

### A. WHY THIS MOTION CANNOT WAIT

The Complaint filed June 8, 2026 is 541 pages and alleges that a small number of AI supply-chain and frontier-model actors have privatized the profits of the AGI transition while externalizing a non-zero risk of catastrophic harm, loss of human

agency, civilizational collapse, and human extinction onto 8.3 billion people and all future generations without consent. The supplemental record filed June 15, 2026 further asserts that the same pleaded framework supplies a proposed remediation architecture through Plaintiff's AI Safety Axioms and Civilization 5.0 Prosperity Axioms. This is not ordinary delay. Plaintiff alleges that AI capability is advancing exponentially and that the window to install enforceable safety guardrails closes with the same exponential speed. In the pre-superintelligence window, courts, boards, engineers, regulators, chip manufacturers, cloud providers, and model developers can still impose physical, firmware-level, cloud-level, model-level, training-level, deployment-level, audit-level, and board-governance safety constraints. After an effective loss-of-control threshold, those same restraints may no longer be practically installable. That is why damages after trial, ordinary discovery, and post-hoc remedial orders are categorically inadequate. The alleged harm is irreversible, uninsurable, and not compensable after the fact. If the safety-installation window closes first, the Court's later judgment may come too late to preserve meaningful judicial relief.

**B. RECENT PUBLIC STATEMENTS BY ANTHROPIC AND DARIO AMODEI SUPPORT THE NEED FOR COURT-ENFORCEABLE STATUS QUO RELIEF**

This application relies in part on public statements for the fact that those statements were made. Dario Amodei's June 2026 essay, "Policy on the AI Exponential," states that AI is advancing at a "lightning pace," that scaling laws predict an exponential increase in general cognitive capabilities with increasing computing power, and that policy and legislation move very slowly relative to AI. See https://darioamodei.com/post/policy-on-the-ai-exponential. Anthropic's related public policy page states that "AI is advancing at exponential speed" and that

governments should have legal authority to "block or deter dangerous deployments" of increasingly capable AI systems; it also calls for transparency, independent evaluation, and robust security programs for frontier developers. See https://www.anthropic.com/policy-on-the-ai-exponential. In a public Bloomberg Originals / The Circuit video clip, Amodei is described as discussing his own estimate of a 10% to 25% risk of civilizational collapse and the need for global checks and balances. See https://youtube.com/shorts/PSPLAS41aLI. Plaintiff cites that public statement as further support for the proposition that non-zero catastrophic risk is now discussed by frontier-AI leadership itself, not merely by outside critics. Plaintiff also relies on Anthropic's June 2026 public essay, "When AI builds itself," for the fact that Anthropic publicly called for the world to have the option to slow or temporarily pause frontier AI development. That same public essay explains that a meaningful slowdown or pause would require multiple frontier laboratories in multiple countries to stop under the same conditions and verify that others have actually stopped; it further explains that training runs are far easier to conceal than missile silos and that the incentive to defect quietly is enormous. These admissions directly support Plaintiff's Rule 65 position: voluntary warnings, essays, public appeals, and nonbinding slowdown requests cannot preserve the status quo; an enforceable court order can. See https://www.anthropic.com/institute/recursive-self-improvement. These public statements sharpen the urgency. Voluntary slowdown is structurally inadequate where each company and each nation fears being second to AGI. That race condition is precisely why a court-enforceable short-term status quo order is necessary: a warning, essay, or public interview has no binding legal force; a Rule 65 order does.

## C. THE SERIAL-TRAP PROBLEM: DISCLOSURE ALONE DOES NOT INSTALL SAFETY

Plaintiff alleges a serial-trap problem. If AI defendants fail to disclose non-zero existential and civilizational risk in securities filings or public-risk materials, Plaintiff contends that material omissions continue. But if they disclose the risk and then continue accelerating without installing auditable safeguards, disclosure alone deepens knowledge without reducing the danger. Either way, the only practical way to interrupt the alleged ongoing public-danger condition is concrete, verifiable remediation. Accordingly, Plaintiff does not ask the Court merely to require words, disclaimers, or risk-factor language. Plaintiff asks for preservation, verified reporting, safety certification, infrastructure identification, and expedited preliminary-injunction proceedings so that safety can be examined while the window to install it remains open.

## D. LEGAL STANDARD

A temporary restraining order may issue without notice only if specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result before the adverse party can be heard, and the movant certifies the efforts made to give notice and the reasons why notice should not be required. Fed. R. Civ. P. 65(b)(1). Every TRO must state the reasons why it issued, state its terms specifically, and describe in reasonable detail the acts restrained or required. Fed. R. Civ. P. 65(d). The familiar injunction factors require consideration of likely success on the merits, likely irreparable harm, the balance of equities, and the public interest. Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008). In the Ninth Circuit, serious questions going to the merits may support relief where the balance of hardships tips sharply toward the movant and the other factors are satisfied. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-35 (9th Cir. 2011). Northern District Civil Local Rule 65-1 requires a TRO motion to be accompanied by the complaint, a memorandum of points and authorities, a proposed TRO and order to

show cause, supporting documents the moving party wants the Court to consider, and a declaration certifying notice or explaining why notice could not be provided. Plaintiff relies on the Complaint already filed as Dkt. 1, the supplemental exhibits already filed in this action, this declaration, and the proposed order submitted with this application.

## E. ARGUMENT

**A. Irreparable harm. The alleged injury includes non-zero risk of** civilizational collapse, human extinction, loss of human agency, irreversible AI loss of control, and global-scale public danger. Such harms cannot be remedied by money damages after trial. No post-hoc award can restore extinct persons, unborn generations, lost human agency, or an unreviewable future in which safety could have been installed but was not.

**B. Serious questions and likely success. The Complaint pleads public** nuisance, negligence, failure to warn, securities nondisclosure theories, public-interest equitable abatement, and a proposed safety-remediation framework. At the TRO stage, Plaintiff need not prove the entire case; he must show at minimum serious questions and a likelihood of irreparable harm before ordinary adversarial proceedings can occur. The pleaded record satisfies that threshold for preservation, reporting, and short status quo relief.

**C. Balance of equities. The requested order is limited. It does not ban AI,** dissolve companies, shut down beneficial research, or decide the merits. It preserves evidence, requires verified safety information, and temporarily prevents materially new unsafeguarded frontier expansion until the Court can hold a preliminary-injunction hearing. The private burden of temporary safety certification and reporting is minimal compared with the alleged public risk borne by 8.3 billion people.

**D. Public interest. The survival, agency, and safe evolution of humanity are** the highest public interests. Public interest also favors transparency, preservation of evidence, independent safety review, and an orderly judicial process before irreversible technological thresholds are crossed.

**E. Ex parte treatment is justified at filing, but service must follow any** order.

Plaintiff has not provided prior notice because no Defendant has appeared and no counsel of record is available on ECF; the action names numerous large entities across the AI supply chain; ordinary notice and briefing may allow the safety-installation window to continue closing before the Court can act; and the requested relief includes preservation and status quo measures whose effectiveness depends on immediate judicial attention. Plaintiff will promptly serve the application, supporting papers, and any order as the Court directs.

**F. EVERY INSTITUTION WITH AUTHORITY NOW FACES A DUTY TO EXAMINE AND, WHERE WARRANTED, TO ACT**

Plaintiff respectfully submits that this is a legal motion, not a philosophical appeal. But where the record alleges non-zero existential risk to all 8.3 billion people and future generations, the law, equity, and conscience converge. Judges, engineers, executives, regulators, investors, parents, children, and citizens all inhabit the same future that this case seeks to preserve. At this moment of alleged civilizational consequence, institutional actors are not being asked to solve every problem of AGI in fourteen days. They are being asked to prevent an alleged non-zero risk of irreversible harm from becoming unreviewable before any court, regulator, board, or jury can examine it. If the Court grants even narrow preservation, reporting, and safety-status relief, it will not end innovation; it will preserve the possibility that innovation remains human-compatible.

**G. PROPOSED RELIEF**

Plaintiff respectfully requests that the Court issue the proposed TRO and Order to Show Cause submitted with this application. In summary, Plaintiff requests: (1) temporary restraint on materially new unsafeguarded frontier-AI deployment or frontier-compute expansion; (2) preservation of all AGI-risk and AI-safety evidence; (3) verified safety status reports within seventy-two hours after service; (4) identification of covered AI infrastructure; (5) designation of a safety liaison; (6) a bond of zero dollars or a nominal amount because the relief is public-interest preservation and reporting; and (7) an expedited preliminary-injunction hearing.

**XIV. DECLARATION OF DR. CHUANPING HU**

I, CHUANPING HU (p/k/a DR. FRANK HU), declare under penalty of perjury under 28 U.S.C. § 1746 as follows:

1. I am the Plaintiff in this action. I appear pro se. I make this declaration based on personal knowledge, my review of the record, and publicly available materials cited in this application.

2. On June 8, 2026, I filed the Complaint in this action. The Complaint is 541 pages and seeks damages, declaratory judgment, preliminary and permanent injunctive relief, and public-interest equitable abatement. The Complaint alleges that Defendants have privatized AI profits while externalizing non-zero AGI survival and evolution risks onto 8.3 billion people without consent.

3. On or about June 15, 2026, I filed supplemental exhibits in support of the Complaint. Those materials include the expanded supporting complaint and the pleaded AI Safety and Civilization 5.0 framework. I do not intend to burden the Court with additional voluminous exhibits for this TRO beyond the already-filed record, this declaration, the proposed order, and public sources cited for the

fact that the statements were made.

4. I have reviewed Dario Amodei's public June 2026 essay titled "Policy on the AI Exponential," Anthropic's related policy page, and the publicly available Bloomberg Originals / The Circuit YouTube Short at https://youtube.com/shorts/PSPLAS41aLI. I understand those public materials to acknowledge rapid or exponential AI progress, the slow pace of policy, the need for government authority to block or deter dangerous deployments, and a public discussion of a 10% to 25% risk of civilizational collapse.

5. I believe immediate relief is necessary because frontier-AI capability, chip supply, cloud compute, automated coding, cyber capabilities, biological-design capabilities, model autonomy, and recursive self-improvement capacity are advancing rapidly. If enforceable safety controls are not installed before a loss-of-control threshold, the Court may later be unable to provide effective relief.

6. I have not provided prior notice of this TRO application before filing because no Defendant has appeared in this action and no counsel of record is available through ECF; because there are many Defendants across the AI supply chain; because ordinary notice and briefing may consume the very time this application seeks to preserve; and because the requested relief includes preservation and status quo measures. I will promptly serve this application, all supporting papers, and any order in the manner and by the deadline set by the Court.

7. I respectfully request that the Court issue the proposed temporary restraining order or, at minimum, immediate preservation, verified safety reporting, infrastructure identification, and an expedited preliminary-injunction hearing. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 22, 2026, in the State of Kansas.

**/s/ CHUANPING HU**

CHUANPING HU (p/k/a Dr. Frank Hu)

Plaintiff, Pro Se c/o All Universe Inc. 16192 Coastal Highway Lewes, Delaware

19958 Telephone: 620-670-0078 Email: frankhu20@gmail.com

**XV. CONCLUSION**

"The Court and the entire world must awaken: The 'Golden Window' for installing

**CONCLUSION AND HISTORIC-DUTY SHOWING**

If the Court allows the defendants to consume time through procedural delays, then before a judgment is rendered, AGI's total intelligence will have thoroughly surpassed humanity's, and the last opportunity to physically and forcibly implant hardware-level safety axioms will be lost forever. Delay, in this case, is tantamount to the murder of the human species.

The attached 541-page Complaint further details that the defendants, including SpaceX and its leadership, face four completed crimes under the facts pleaded: securities fraud by non-disclosure of non-zero AGI extinction risk (confirmed by Hinton's 10-20% assessment and Musk's own April/May 2026 testimony in the OpenAI case), plus three additional completed and aggravated crimes of reckless endangerment of human life on a planetary scale, public endangerment through continued acceleration while externalizing risk to 8.3 billion people, and related offenses of threatened catastrophic harm. The Complaint seeks damages exceeding $106 trillion. Because SpaceX is now a publicly traded company, non-disclosure or failure to update SEC filings after receipt of this sworn record constitutes a continuing material omission and ongoing regulatory exposure. The plaintiff stands ready with a complete, patent-protected remediation framework. Prompt investigation is required before the exponential closure of the safety-installation window renders remediation impossible. The Court, the presiding judge, and any jury members now stand at a historic crossroads. The

sworn public record, the plaintiff's ready remediation framework, and the exponential closure of humanity's last safety-installation window have been placed before this Court. Should this Court, after receiving this motion, decline to issue the requested TRO, future generations and the judgment of history may one day ask whether those entrusted with the power to protect humanity from existential threats fulfilled their duty when the evidence and the tools were provided. The plaintiff respectfully submits that prompt judicial action is the only response consistent with this Court's mandate to protect the public and with the moral responsibility that attaches to institutions possessing judicial authority at this moment of civilizational consequence. The plaintiff believes that individuals within this Court who are also parents, grandparents, spouses, and citizens will recognize that, when non-zero existential risk to 8.3 billion people is credibly documented with both the problem and the solution, the duty to examine and, where warranted, to act, is not optional but imperative.

AI Safety Axioms is not indefinitely open; it is closing at light-speed with the exponential surge in computing power." — Complaint, at 125 For the foregoing reasons, Plaintiff respectfully requests that the Court grant the ex parte application, issue the proposed temporary restraining order, order preservation and verified reporting, set an expedited preliminary-injunction hearing, and grant such other relief as justice and the public interest require.

WHEREFORE, Plaintiff respectfully requests that this Court:

**A. Issue an immediate Temporary Restraining Order without prior notice to** Defendants, as authorized by Fed. R. Civ. P. 65(b);

**B. Order the relief specified above;**

**C. Set a hearing for a Preliminary Injunction at the earliest possible date;**

and

**D. Grant such other and further relief as the Court deems just and proper.**

Dated: June 22, 2026 Respectfully submitted,

**/s/ CHUANPING HU**

CHUANPING HU (p/k/a Dr. Frank Hu)

Plaintiff, Pro Se

**c/o ALL UNIVERSE INC.**

16192 Coastal Highway

Lewes, Delaware 19958

Email: frankhu20@gmail.com

Phone: 620-670-0078

**APPENDIX OF CITED SOURCES**

The following source list is included for the Court's reference and for

verification of the public materials cited in this emergency motion.

Source 1: Bloomberg Interview with Dario Amodei (June 19, 2026)

Title: "Anthropic CEO Addresses AI Civilizational Collapse"

Platform: Bloomberg Originals / The Circuit

URL: https://youtube.com/shorts/PSPLAS41aLI

Key Quote: Amodei stated his own estimate of a 10% to 25% risk of civilizational

collapse.

Source 2: Dario Amodei – 25% Catastrophic Risk Statement (May 5, 2026)

Key Quote: Amodei has said there is a 25% chance that "things go really, really

badly"

URL: https://finance.yahoo.com/news/anthropic-ceo-dario-amodei-says-101600375.html

Source 3: Anthropic – AI Models Could Increase Risk of Humans Losing Control

URL: https://www.yahoo.com/tech/anthropic-warns-ai-recursive-self-130000278.html

Source 4: Anthropic Blog Post – "When AI builds itself" / Recursive Self-Improvement (June 4, 2026)

Title: Anthropic Institute publication on recursive self-improvement

Organization: Anthropic PBC

URL: https://www.anthropic.com/institute/recursive-self-improvement

Key Quote: "We believe it would be good for the world to have the option to slow or temporarily pause frontier AI development."

Access Date: June 22, 2026

Source 5: Dario Amodei Essay – "Policy on the AI Exponential" (June 2026)

URL: https://darioamodei.com/post/policy-on-the-ai-exponential Key Quotes:

"Biological risks may soon follow, and that serious AI autonomy risks may not be far behind".

Source 6: Dario Amodei – Biological Risks and Autonomy Risks

URL:

https://www.livemint.com/ai/anthropic-ceo-dario-amodei-says-ai-poses-25-risk-of-civilizational-collapse-11749324985635.html

Source 7: Dario Amodei – AI Race with China, "No Enforceable Agreement"

URL:

https://www.inside-it.ch/dario-amodei-anthropic-chef-warnt-vor-kuenstlicher-intelligenz-20260129

Source 8: Dario Amodei – Atomic Bomb Chain Reaction Comparison

URL: https://www.weforum.org/stories/2026/01/dario-amodei-ai-risk-davos-2026/

Source 9: Anthropic – "Without a Global Coordination Mechanism" Acknowledgment

URL:

https://www.internetgovernance.org/2026/06/07/anthropic-recursive-self-improvement-pause-proposal/

Source 10: Geoffrey Hinton – Nobel Prize Banquet Speech (December 10, 2024)

URL: https://www.nobelprize.org/ (Nobel Prize Banquet Speech, December 10, 2024)

Source 11: Elon Musk – Testimony in Musk v. OpenAI (April 2026)

Source: Associated Press, April 2026 (available via AP News archive)

Source 12: Global Insurance Industry Exclusion (Effective January 1, 2026)

Event: Global insurance industry formally excluded AGI existential risk from coverage

Source 13: Anthropic Policy Page – "Policy on the AI Exponential" (June 2026)

Organization: Anthropic PBC

URL: https://www.anthropic.com/policy-on-the-ai-exponential

Key Point: Anthropic states that AI is advancing at exponential speed, that transparency alone is no longer sufficient, and that government authority should be able to block or deter dangerous deployments.

Access Date: June 22, 2026